J-S61041-14

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| JESSICA ELIZABETH RHODES, | : | |
| | : | |
| Appellant | : | No. 834 WDA 2014 |

Appeal from the Judgment of Sentence Entered January 23, 2014,
In the Court of Common Pleas of Fayette County,
Criminal Division, at No(s): CP-26-CR-0000120-2013

BEFORE: FORD ELLIOTT, P.J.E., WECHT, and STRASSBURGER,[*] JJ.

MEMORANDUM BY: STRASSBURGER, J.:       **FILED NOVEMBER 10, 2014**

Jessica Elizabeth Rhodes (Appellant) appeals from the judgment of sentence entered January 23, 2014, following her convictions for aggravated assault, simple assault, endangering the welfare of children (EWOC), and recklessly endangering another person (REAP).[1]  We affirm.

The certified record reveals the following facts.  On December 1, 2012, Appellant brought her 14-month-old son to the emergency room at Uniontown Hospital.  Appellant told emergency room staff that the child fell and struck his head on a hard floor, rendering him unresponsive.  Uniontown Hospital treating physician, Dr. Bruce Teich, determined that the child had significant intracranial bleeding.  Due to the severity the child's injuries, he was flown to the Children's Hospital of Pittsburgh for treatment.  The child

---

[1] 18 Pa.C.S. §§ 2702(a)(1), 2701(b)(2), 4304(b), and 2705, respectively.

[*] Retired Senior Judge assigned to the Superior Court.

was in critical condition and comatose upon his arrival at Children's Hospital. Additional testing revealed that he suffered a subdural hematoma and extensive retinal hemorrhaging.

Believing that Appellant's explanation did not account for the actual injuries sustained, Dr. Teich contacted Fayette County Children and Youth Services (CYS) to report suspected child abuse. In response, Pennsylvania State Police Troopers Daniel Boyd and John Krause twice interviewed Appellant at Children's Hospital, once on the day of the incident, and again on December 5, 2012. During the second interview, Appellant admitted to the troopers that after her child fell, she shook him twice to stop him from crying. As a result of this statement, Appellant was arrested and charged with the above-mentioned offenses.

On March 12, 2013, Appellant filed a motion seeking to suppress her statements to police on both December 1 and December 5, 2012, claiming that those statements were taken in violation of **Miranda v. Arizona**, 384 U.S. 436 (1966). Following a hearing on April 19, 2013, the trial court denied Appellant's motion.

The matter proceeded to a jury trial on January 6, 2014. Appellant was convicted on all counts, and on January 23, 2014, she was sentenced to a term of three to six years' imprisonment. This appeal followed. Appellant complied with the trial court's order to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925.

Appellant raises three issues for our review.

1. Whether the [suppression] court erred by failing to suppress various oral and written statements made by [Appellant] to the police without counsel [present]?

2. Whether the [trial] court erred by allowing an emergency room doctor, Dr. Bruce Teich, to hypothesize [on] how the injuries were caused to the child victim []?

3. Whether the evidence was legally and factually insufficient to prove that [Appellant] committed the crimes of: aggravated assault, [EWOC], simple assault, [and REAP]?

Appellant's Brief at 3 (capitalization omitted).

Appellant first challenges the admissibility of the statements she made to police during questioning in December of 2012. Specifically, Appellant contends that her interactions with State Troopers Boyd and Krause on both December 1 and December 5, were custodial interrogations requiring *Miranda* warnings from the start. Appellant's Brief at 11-12. Appellant concedes that she was *Mirandized* in the middle of her second interview, prior to giving a written statement, but maintains that this does not cure the initial defect. *Id.* at 12-13. Accordingly, Appellant believes that her statements to police should have been suppressed.

We have discussed our review of suppression claims as follows:

When considering the denial of a suppression motion, this Court's review is limited to determining whether the [lower] court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed in the suppression court, we consider only the Commonwealth's evidence and so much of the appellant's evidence as is uncontradicted when read in the

context of the record as a whole. Where the record supports the suppression court's factual findings, we are bound by those facts and may reverse only if the legal conclusions drawn from them are erroneous.

***Commonwealth v. West***, 937 A.2d 516, 527 (Pa. Super. 2007) (internal citations omitted).

Additionally, we note that

the ***Miranda*** safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. Thus, interrogation occurs where the police should know that their words or actions are reasonably likely to elicit an incriminating response from the suspect. [I]n evaluating whether ***Miranda*** warnings were necessary, a court must consider the totality of the circumstances. In conducting the inquiry, we must also keep in mind that not every statement made by an individual during a police encounter amounts to an interrogation. Volunteered or spontaneous utterances by an individual are admissible even without ***Miranda*** warnings.

***Commonwealth v. Williams***, 941 A.2d 14, 30 (Pa. Super. 2008) (citations and quotation marks omitted).

Whether a person is in custody for ***Miranda*** purposes depends on whether the person is physically denied of [his or her] freedom of action in any significant way or is placed in a situation in which [he or she] reasonably believes that [his or her] freedom of action or movement is restricted by the interrogation. Moreover, the test for custodial interrogation does not depend upon the subjective intent of the law enforcement officer interrogator. Rather, the test focuses on whether the individual being interrogated reasonably believes [his or her] freedom of action is being restricted.

Under the totality of the circumstances approach, the following factors are relevant to whether a detention has become so coercive as to constitute the functional equivalent of a formal arrest: the basis for the detention; its length; its location; whether the suspect was transported against his or her will, how

far, and why; whether restraints were used; whether the law enforcement officer showed, threatened or used force; and the investigative methods employed to confirm or dispel suspicions.

*Id.* at 30-31 (citations and quotations omitted).

Instantly, Trooper Boyd testified at the suppression hearing. Appellant did not testify, nor did she present any witnesses on her behalf. The suppression court made the following findings of fact.

1. On December 1, 2012, [Troopers Boyd and Krause] went to Children's Hospital in Pittsburgh, Pennsylvania, to investigate an incident involving a baby who had been injured in his home.

2. The Troopers, not wearing uniforms, arrived at 7:00 pm[.]

3. At the hospital, the troopers met the child's mother, [Appellant], along with several family members, in the waiting room, and asked to speak with her.[2]

4. [Appellant agreed] to speak to the Troopers, [and] the three of them proceeded to a private room immediately next to the waiting room and discussed what had occurred.

5. Thereafter, on December 5, [2012], the Troopers returned to Children's Hospital and again asked to speak to [Appellant].

6. [Appellant] once more [agreed] to speak with the Troopers, who were not in uniform, [and] the three of them left the waiting room and proceeded to the same private room in which they spoke on December 1, [2012].

7. As before, the door was closed but not locked, and neither Trooper blocked [Appellant's] ability to leave the room.

---

[2] The suppression court considered the limited issue of whether Appellant's statements were given freely and voluntarily; thus, the substance of this discussion was not introduced at the suppression hearing. N.T., 4/19/2013, at 8.

8. [Appellant] was advised that the Troopers wanted to speak with her another time about how her child had been injured.

9. **[Appellant] was also advised that she was not under arrest and was free to leave at any time.**

10. [Appellant] appeared to understand what she was being advised of, did not leave the room, agreed to speak with the Troopers, and responded appropriately to questions.

11. During the conversation with the Troopers, [Appellant] stated that she shook the baby.

12. Upon [making] this statement, [Appellant] was placed under arrest and given her *Miranda* rights, [she] indicated that she understood her rights, waived her rights, and provided a written statement.

13. [Appellant] understood what was being said to her and was not under the influence of [any drugs or alcohol].

14. No promises or threats were made to induce either the verbal or written statements, nor was any force used to obtain any statements.

15. The oral and written statements of [Appellant] were made knowingly, intelligently, and voluntarily.

16. The testimony of Trooper Boyd, which was not contradicted, was credible.

Suppression Court Opinion, 7/3/2014, at 2-3 (emphasis added).

Based on these findings, the suppression court concluded that, under the totality of the circumstances, *Miranda* warnings were unnecessary prior to when they were actually given. *Id.* at 5. We agree and find Appellant's argument to the contrary unavailing. The evidence of record reveals that Appellant was not in custody for the purposes of *Miranda* on December 1 or

December 5, prior to her admission. The door to the interview room was closed for privacy but remained unlocked. Appellant was expressly informed that she was free to leave; she was not restrained in any way; and no force, threats, or promises were made to elicit her incriminating statements. Accordingly, we hold that the suppression court did not err in denying Appellant's motion to suppress.

Appellant next argues that the trial court abused its discretion by permitting Dr. Teich to render an improper expert opinion as to the causation of the child's injuries. Appellant's Brief at 14.

> As a general rule, in order to be deemed an expert witness, one must only possess more expertise than is within the ordinary range of training, knowledge, intelligence, or experience. Our standard of review for the competency of expert witnesses is well established:
>
>> the question whether a witness is qualified to testify as an expert is within the sound discretion of the trial court and will not be overturned except in clear cases of abuse. In Pennsylvania, a liberal standard for the qualification of an expert prevails. Generally, if a witness has any reasonable pretension to specialized knowledge on the subject matter under investigation he may testify and the weight to be given to his evidence is for the [fact finder]. *It is also well established that an expert may render an opinion based on training and experience.*

***Commonwealth v. Jennings***, 958 A.2d 536, 539 (Pa. Super. 2008) (citations, quotation marks and footnotes omitted; emphasis in original).

In this case, Dr. Teich, the treating physician at Uniontown Hospital, was offered by the Commonwealth as an expert in emergency medicine.

N.T., 1/6/2014, at 68-72. Appellant's counsel objected on the basis that Dr. Teich was not a pediatrician and had no specialization or expertise in shaken baby syndrome or of the biomechanics and the determination of force in such cases. *Id.* at 71. Counsel's objection was overruled, and Dr. Teich was permitted to testify. *Id.* at 72. A few questions into the doctor's testimony, counsel objected again. At this point, the assistant district attorney clarified that the doctor was present to testify as to what he did on the day Appellant brought her child to the hospital. *Id.* at 73. Dr. Teich then discussed his examination of child in the two hours following his admission to Uniontown Hospital. *Id.* at 73-79.

On appeal, Appellant challenges the following exchange, which occurred during the doctor's direct examination.

> Q [by the assistant district attorney]: Upon your discharge or upon transfer [of child to Children's Hospital], based upon your treatment of [child] for that two hours, what was the discharge diagnosis?
>
> A: Primary diagnosis would be coma and secondary was the subdural hematoma.
>
> Q: Now, I noticed in your records that there's noted that there is some concern as to history and mechanism, history slash mechanism of injury. What does that mean?
>
> A: My concern was that children fall all of the time and the report to us was that the child -- the report to me is that the child had fallen near a couch and had fallen backwards and struck his head and that is what caused, you know, the mother to bring the child in. My concern was, as a physician, we see head injuries in children all of the time and certainly most children do not have such a significant result from this

description and my concern was that what was told to me didn't particularly fit with what my findings were. There was some sort of significant trauma that occurred to this child more so than just falling.

Q: Based upon your training and experience, what type of significant trauma would cause what you observed in those two hours?

A: If it is a fall, it's certainly a fall from a higher or bigger height, not just, you know, a couple of feet, you know maybe six feet or ten feet.

Q: Okay?

A: Or other direct impact, blunt trauma to the head causing this type of injury.

Q: What type of force would cause that type of injury as far as trauma wise?

A: Well, I don't know how else to describe it. It is a much more major force. You know just falling from a couple of feet, that didn't explain --

[Defense Counsel]: Objection.

The Court: Overruled.

A. -- or account for it.

Q: Based upon that, did you notify any social services organization?

A: Yes, when we're concerned, we notify CYS social services and we notified CYS and they are involved.

Q: You are, in fact, mandated by law; correct?

A: Yes. Yes.

Q: Now, doctor, the opinions you stated today regarding the injuries and diagnosis and things of that nature, are those all

stated within a reasonable degree of medical certainty in the field of emergency medicine?

A: Yes.

*Id.* at 76-78.

Specifically, Appellant contends that because Dr. Teich was certified only as an expert in emergency medicine, as opposed to pediatrics, he was not qualified to "hypothesize that the [child's] extensive injuries could only be caused by either a fall from six to ten feet or from blunt trauma." Appellant's Brief at 15.

We begin by noting that it is "well-settled that a defendant's failure to object to allegedly improper testimony at the appropriate stage in the questioning of the witness constitutes waiver." ***Commonwealth v. Molina***, 33 A.3d 51, 55 (Pa. Super. 2011) (citation omitted). However, even if Appellant's objection to Dr. Teich's opinion testimony was timely, she would still not be entitled to relief.

Viewing the record in its entirety, we determine that Dr. Teich's testimony regarding his observations of the child in the emergency room and subsequent diagnosis was based upon his knowledge, training and experience in the field of emergency medicine. This testimony was not speculative. Indeed, his qualifications would certainly permit Dr. Teich to opine that subdural hematomas and comas seen in the emergency room setting are typically the result of blunt force trauma. Moreover, his

testimony as to the severity of the child's injuries and the apparent disconnect between those injuries and their purported cause was relevant to explain why CYS was contacted and a criminal investigation was begun. Accordingly, we find no abuse of discretion in permitting the doctor to testify.[3]

Finally, Appellant challenges the sufficiency of the evidence presented at trial, arguing that the Commonwealth failed to prove that she acted with the requisite *mens rea* for each of the aforementioned offenses.

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while

---

[3] Additionally, the record reveals that, despite Appellant's objection that the doctor was unqualified to testify regarding shaken baby syndrome, the Commonwealth did not question Dr. Teich in that regard. Instead, the Commonwealth offered another expert witness, Dr. Janet Squires, as an expert in the field of child abuse pediatrics. Nonetheless, on cross examination, Appellant's counsel established that Dr. Teich was unfamiliar with shaken baby syndrome and the amount of force required to inflict a severe head injury on a child. N.T., 1/6/2014, at 79-85.

passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Knox*, 50 A.3d 749, 754 (Pa. Super. 2012) (quoting

*Commonwealth v. Brown*, 23 A.3d 544, 559–60 (Pa. Super. 2011) (*en banc*)).

Under the Crimes Code, a person may be convicted of aggravated assault if she "attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly, or recklessly under circumstances manifesting extreme indifference to the value of human life." 18 Pa.C.S. § 2702(a)(1). Serious bodily injury is defined by the Crimes Code as "bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S. § 2301.

It is well-established that

> [w]here, as here, the victim suffered serious bodily injury, the Commonwealth may establish the *mens rea* element of aggravated assault with evidence that the assailant acted either intentionally, knowingly, or recklessly. Looking first to whether evidence established intent to cause serious bodily injury, we note that such an inquiry into intent must be determined on a case-by-case basis. Because direct evidence of intent is often unavailable, intent to cause serious bodily injury may be shown by the circumstances surrounding the attack. In determining whether intent was proven from such circumstances, the fact finder is free to conclude the accused intended the natural and probable consequences of his actions to result therefrom.

*Commonwealth v. Bruce*, 916 A.2d 657, 661-62 (Pa. Super. 2007) (citations, quotation marks and footnotes omitted).

With regard to REAP, 18 Pa.C.S. § 2705 provides that "[a] person commits a misdemeanor of the second degree if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury."

> We have held that a person is guilty of [REAP] when it is shown that the person (1) possessed "a *mens rea* recklessness," (2) committed a wrongful deed or guilty act ("*actus reus*"), and (3) created by such wrongful deed the danger of death or serious bodily injury to another person. The element of "*mens rea* recklessness" has been defined as "a conscious disregard of a known risk of death or great bodily harm to another person." "Serious bodily injury" is defined as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ. We have further held that Section 2705 "was directed against reckless conduct entailing a serious risk to life or limb out of proportion to any utility the conduct might have" had. Finally, the perpetrator must create an actual condition of danger, not merely an apprehension of danger.

*Commonwealth v. Emler*, 903 A.2d 1273, 1278 (Pa. Super. 2006) (citations  and bolding omitted).

With regard to simple assault, the statute provides, in relevant part, that "[a] person is guilty of assault if he: (1) attempts to cause or intentionally, knowingly or recklessly causes bodily injury to another…." 18 Pa.C.S. § 2701(a)(1).   18 Pa.C.S. § 2301 defines "bodily injury" as "[i]mpairment of physical condition or substantial pain."

Finally, "a parent … commits [the offense of EWOC] if he [or she] knowingly endangers the welfare of the child by violating a duty of care, protection or support". 18 Pa.C.S § 4304(a)(1). Accordingly, the *mens era* for EWOC is a knowing violation of a duty of care. "A person acts knowingly with respect to a material element of an offense when: (i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and (ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result." 18 Pa.C.S. § 302.

Notably, there is a substantial overlap of the *mens rea* required for each offense. We begin by observing that the severe and substantial nature of the child's injuries is not in dispute. Moreover, for the purposes of the EWOC charge, Appellant's testimony established that the injuries were sustained while in her care. With respect to the causes of those injuries, the jury was presented with evidence from which they could reasonably infer that Appellant caused those injuries to the child. First, Dr. Squires, the Commonwealth's expert in child abuse pediatrics, testified that, in her opinion, the child's injuries were caused by a "severe shaking" of the child. N.T., 1/6/2014, at 105-06. ("My diagnosis was inflicted trauma and there might have been some impact [from a fall], I'm not saying that there wasn't,

-14-

but some of it had involved shaking. There had to be some component of the child's head going back and forth and that is what caused the major brain injury"). Dr. Squires clarified that the injuries she observed were inconsistent with the child falling from a standing position to the floor, as Appellant initially reported. *Id.* at 107-08. This evidence is sufficient to allow the jury to conclude that the child was injured due to a violent shaking.

In her written statement, which was introduced at trial, Appellant admitted that on the day of the incident, the child had struck his head in a fall and was crying. She then "shook him twice" to stop him from crying, after which he "started to shake on his own and his eyes got big and he wasn't responsive." Appellant's Written Statement, 12/5/2012.[4]

Although Appellant argues that she "did not know, nor could she have known, that merely shaking her child back and forth only twice could possibly injure her child," Appellant's Brief at 17, we are unconvinced that it is outside of the average adult's understanding that shaking a baby violently will result in, possibly serious, injury. *See Commonwealth v. Smith*, 956 A.2d 1029, 1039 (Pa. Super. 2008) (observing that "It takes nothing more than common sense for an adult…to know that violently shaking an infant

---

[4] Appellant denied the veracity of this statement at trial, testifying that she did not shake him, but instead picked him up to comfort him following the fall and he became catatonic after 30 seconds. N.T., 1/6/2014, at 136-37, 141-42. As discussed above, the likelihood of this version of events was disputed by Dr. Squires.

child with enough force to cause an abusive head trauma could threaten the child's physical and/or psychological welfare.")

Accordingly, viewing the evidence in the light most favorable to the Commonwealth and acknowledging that it is permissible for the factfinder to infer that one intended the natural consequences of her actions, **Bruce**, *supra*, we hold that the evidence presented here was sufficient to allow the factfinder to infer that Appellant shook the child violently with the intention of seriously injuring him. Moreover, we hold that the evidence was sufficient to prove that Appellant acted recklessly with a conscious disregard of a known risk of death or great bodily harm to the child. Likewise, the evidence supports a finding that Appellant should have been aware that the child could be injured by her actions and knowingly disregarded this possibility. Accordingly, based on the foregoing, we hold that the evidence was sufficient to sustain each of Appellant's convictions. **See Smith**, 956 A.2d at 1036-39 (holding that evidence was sufficient to find Smith possessed the requisite *mens rea* to commit aggravated assault, EWOC, and REAP where neurosurgeon testified that the traumatic brain injury suffered by Smith's child while in Smith's care was consistent with violent shaking).

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/10/2014