**COMMONWEALTH of Pennsylvania,**
**Appellee**

v.

**Cory SMITH, Appellant.**

Superior Court of Pennsylvania.

Argued March 12, 2008.

Filed Sept. 4, 2008.

MaryJean Glick, Public Defender, Lancaster, for appellant.

Ryan T. Boop, Assistant District Attorney, Lancaster, for Commonwealth, appellee.

BEFORE: FORD ELLIOTT, P.J., STEVENS, ORIE MELVIN, LALLY-GREEN, KLEIN, BENDER, BOWES, GANTMAN, and SHOGAN, JJ.

OPINION BY LALLY-GREEN, J.:

¶ 1 Appellant, Cory Smith, appeals from the judgment of sentence entered on January 4, 2006. We affirm in part, vacate in part, and remand.

¶ 2 The factual and procedural history of the case is as follows. On December 18, 2002, Appellant brought his infant son, Korey Smith, to a Christmas party for a short time. Witnesses from the party testified that the child appeared happy and normal. Sometime after Appellant returned home from the party, with the child under his exclusive control, Appellant called 911 because the child was exhibiting unresponsive behavior. When the paramedics arrived, they found the child unresponsive and flaccid.

¶ 3 The child was taken to Hershey Medical Center, where he underwent a CAT scan, which revealed bleeding around his brain. The treating pediatric neurosurgeon, Dr. Dias, testified that the brain injuries suffered by the child had occurred on December 18, 2002, and that they were the result of an abusive head trauma, commonly known as Shaken Baby Syndrome. N.T., 10/4/2005, at 268–269. Dr. Dias determined that this trauma could not be caused by playful handling, but rather from a violent shaking beyond the realm of normal behavior. *Id.* at 268, 288. As a result, the child has suffered brain damage that has significantly impaired his cognition and motor skills. The child has undergone significant, continuing medical treatment. The Department of Public Welfare (DPW) has paid the child's medical expenses though its Medical Assistance program.

¶ 4 On October 6, 2005, following a jury trial, Appellant was convicted of aggravated assault, recklessly endangering another person (REAP), and endangering the welfare of a child (EWOC). On January 4, 2006, the court sentenced Appellant on the aggravated assault charge to a prison term of five to ten years, plus ten years' consecutive probation, plus restitution up to a maximum amount of $1,481,562.54.[1] The court also sentenced Appellant to a consecutive five-year probation term for EWOC.

---

1. This sum includes both expenses incurred in the past and those that will be incurred in the future. The court later reduced this amount by $8,619.95 to avoid double-counting of a certain sum that is not relevant to this appeal.

¶ 5 On January 13, 2006, Appellant filed a timely motion to modify the sentence. Appellant raised three issues relating to restitution. On May 19, 2006, the court held a hearing on these issues. The court denied Appellant's motion on June 1, 2006. This timely appeal followed.[2]

¶ 6 Appellant raises six issues on appeal:

1. Did the trial court err in ordering Mr. Smith to pay restitution to the Department of Public Welfare, which is not a victim under 18 Pa. C.S. § 1106(h), and is not entitled to restitution?

2. Did the trial court err in ordering Mr. Smith to pay $1,426,520 restitution for future medical expenses and babysitting services, where such restitution was speculative, and where the court's capping restitution rather than setting a definitive amount constituted an illegal delegation of the determination of the actual amount of restitution?

3. In light of the prosecutor's inaccurate definition of negligence, did the trial court err in refusing to charge the jury that Mr. Smith could not be found guilty of aggravated assault, recklessly endangering another person, or endangering the welfare of a child, if his conduct was criminally negligent?

4. Did the Commonwealth fail to prove beyond a reasonable doubt that Mr. Smith committed aggravated assault, where the evidence did not establish that Mr. Smith consciously disregarded a substantial and unjustifiable risk that serious bodily injury or death would result from his conduct?

5. Did the Commonwealth fail to prove beyond a reasonable doubt that Mr. Smith committed the offense of recklessly endangering another person, where the evidence did not establish that Mr. Smith consciously disregarded a known risk of death or great bodily harm to Korey Smith?

6. Did the Commonwealth fail to prove beyond a reasonable doubt that Mr. Smith committed the offense of endangering the welfare of a child, where the evidence did not establish that he knowingly violated a duty of care to Korey Smith or that he was aware that his actions had placed the child in circumstances that could threaten his physical welfare?

Appellant's Brief at 5. For ease of reference, we have switched the order of issues one and two on appeal.

■ ¶ 7 First, Appellant argues that the DPW is not entitled to restitution as a matter of law. In a companion case to the instant case, we held that the DPW is entitled to restitution under similar facts. *Commonwealth v. Brown*, 2008 PA Super 156 (*en banc*). Because *Brown* controls, Appellant's first issue lacks merit.

■ ¶ 8 Next, Appellant challenges the nature of the restitution order. He raises two sub-arguments. We will address the second sub-argument first. Specifically, Appellant contends that the court violated the express terms of the restitution statute, 18 Pa.C.S.A. § 1106, because the court failed to set an amount and method of payment at sentencing. By extension, Appellant argues that the court improperly

**2.** On July 10, 2006, the trial court ordered Appellant to file a concise statement of matters complained of on appeal pursuant to Pa.R.A.P.1925(b). Appellant filed a timely concise statement on July 24, 2006. The trial court filed its Rule 1925 opinion on August 14, 2006.

delegated its duties to the Department of Probation and Parole.

¶ 9 The record reflects that Appellant did not include this issue at sentencing, in post-sentence motions, or in his concise statement of matters complained of on appeal under Pa.R.A.P.1925. Ordinarily, such a lapse would render the issue waived. *See, e.g.,* Pa.R.A.P. 302(a); *Commonwealth v. Castillo,* 585 Pa. 395, 888 A.2d 775 (2005). We have held, however, that a challenge of this sort is a non-waivable challenge to the legality of the sentence because it implicates the trial court's statutory authority to impose restitution. *Commonwealth v. Mariani,* 869 A.2d 484 (Pa.Super.2005); *see also In the Interest of M.W.,* 555 Pa. 505, 725 A.2d 729 (1999) (a claim that restitution is excessive is a challenge to the discretionary aspects of the sentence, while a claim that restitution was inappropriate is a challenge to the legality of the sentence); *Commonwealth v. Pleger,* 934 A.2d 715, 719–721 (Pa.Super.2007); *Commonwealth v. Oree,* 911 A.2d 169 (Pa.Super.2006).

¶ 10 Restitution is governed by 18 Pa.C.S.A. § 1106, which provides, in relevant part:

**§ 1106. Restitution for injuries to person or property**

**(a) GENERAL RULE.**—Upon conviction for any crime wherein property has been stolen, converted or otherwise unlawfully obtained, or its value substantially decreased as a direct result of the crime, or wherein the victim suffered personal injury directly resulting from the crime, the offender shall be sentenced to make restitution in addition to the punishment prescribed therefor.

**(c) MANDATORY RESTITUTION.**—

(1) The court shall order full restitution:

(i) Regardless of the current financial resources of the defendant, so as to provide the victim with the fullest compensation for the loss. [ . . . ]

**(2) At the time of sentencing the court shall specify the amount and method of restitution.** In determining the amount and method of restitution, the court:

(i) Shall consider the extent of injury suffered by the victim, the victim's request for restitution as presented to the district attorney in accordance with paragraph (4) and such other matters as it deems appropriate.

**(ii) May order restitution in a lump sum, by monthly installments or according to such other schedule as it deems just.**

[ . . . ]

(3) The court may, at any time or upon the recommendation of the district attorney that is based on information received from the victim and the probation section of the county or other agent designated by the county commissioners of the county with the approval of the president judge to collect restitution, alter or amend any order of restitution made pursuant to paragraph (2), provided, however, that the court states its reasons and conclusions as a matter of record for any change or amendment to any previous order.

18 Pa.C.S.A. § 1106(a), (c) (emphasis added). Consistent with the plain language of § 1106(c)(2), our Courts have held that the trial court may not impose a general order of restitution at sentencing and then "work out the details" and amounts at a later date. *Mariani,* 869 A.2d at 486. "[A]n order of restitution to be determined later is *ipso facto* illegal." *Id.* Similarly, "the sentencing court bears the duty of determining the specifics of restitution. The court is not free to delegate these duties to an agency." *Commonwealth v. Deshong,*

850 A.2d 712, 716 (Pa.Super.2004) (brackets and citations omitted).

¶ 11 The record reflects that at the sentencing hearing, the court ordered Appellant "to pay costs, [and] make restitution, which is capped at $1,481,562.54." N.T., 1/4/2006, at 32. While the court did set a maximum cap, the court did not specify any particular amount of restitution, particularly as to future medical expenses. Moreover, the court did not specify any method of payment.

¶ 12 We recognize that the court held a post-sentence motion hearing at which the court attempted to clarify both the amount and the method of payment. N.T., 5/19/2006, at 4–5. Specifically, the court indicated its belief that Appellant would pay the amounts that the DPW incurs on an ongoing, "pay-as-you-go" basis. *Id.* at 5–6; *see also* Trial Court Opinion,

8/14/2006, at 4 n. 2 ("It is important to note that the Commonwealth is not seeking these costs from Defendant unless they are actually incurred by [the victim]. The purpose of including them in restitution is only so that if such costs are accrued, Defendant will be responsible for their payment.") Unfortunately, the court never modified the sentencing order to make these facts clear. Rather, the certified record continues to reflect only a generalized order of restitution with no amount or method of payment.[3] We are constrained to hold that such an order is illegal and must be corrected.[4]

■■■■ ¶ 13 In his third issue, Appellant argues that the trial court erred when it refused to instruct the jury that negligence is insufficient to support a conviction. A jury instruction will be upheld if it "clearly, adequately, and accurately reflects the

---

3. We note that we have no quarrel with the broad outlines of the trial court's proposed restitution scheme, set forth above. On remand, the trial court should again bear in mind that it has the authority to "order restitution in a lump sum, by monthly installments or according to such other schedule as it deems just." 18 Pa.C.S.A. § 1106(c)(2)(ii). Thus, the court has considerable discretion to construct a payment schedule that would allow Appellant to pay the medical expenses either as they come due, or on some other regular basis. For example, the court could set up a plan where the DPW submits expenses on a yearly basis, and gives Appellant the opportunity to review those expenses before the court reviews them and orders Appellant to pay them. *See Mariani.* In any event, we do not purport to limit the court's discretion as to the best method of setting an amount and a method of payment.

Appellant also argues that the restitution amount for future medical expenses was excessive and speculative. As a result of our disposition, we need not address this argument. We do note that if the court enters a specific order directing Appellant to pay the expenses that the DPW actually incurs for medical care as a direct result of Appellant's crime, the court could largely eliminate any

claim that the restitution order is excessive or speculative. For further guidance, we direct the trial court to *Pleger, supra* (setting forth important general principles regarding the nature and scope of restitution).

4. The Commonwealth relies on *Oree,* but that case does not compel a different result. In *Oree,* the defendant was ordered to pay a fixed and capped amount of $1,229,229.09 in restitution, arising from the fact that the defendant's attack caused a permanent brain injury to the victim. *Oree,* 911 A.2d at 171. The restitution was for monthly nursing home care expenses, spread over the victim's projected lifespan. *Id.* Importantly, the defendant in *Oree* did not claim that the order was illegal because it failed to set an amount or method of payment. Rather, the defendant claimed that the order amounted to cruel and unusual punishment, in that the defendant would be making restitution payments for the rest of his life. *Id.* at 173. The defendant also argued that the order was unconstitutionally disproportionate to his degree of fault, because he was acquitted of aggravated assault. *Id.* at 174. Because the *Oree* Court did not examine the issues before us in the instant case, it is not dispositive. Appellant is entitled to relief on this claim.

law." *Commonwealth v. Davis*, 861 A.2d 310, 323 (Pa.Super.2004). The trial court has broad latitude in the specific wording of jury instructions; the court need not accept any party's particular wording. *Id.* Finally, "it is settled that a trial court should not instruct the jury on legal principles which have no application to the facts presented at trial." *Commonwealth v. Taylor*, 583 Pa. 170, 876 A.2d 916, 925 (2005) (citation omitted).

¶ 14 The record reflects that the trial court accurately informed the jury of the required mental state for each crime. N.T., 10/6/2005, at 543–546. The court also explicitly instructed the jury that if they did **not** find the necessary mental state, then they "must find the defendant not guilty." *Id.* at 544–546. In doing so, the court adequately instructed the jury that any lesser finding was insufficient. The court acted within its discretion when it declined to make that instruction even more explicit.

■ ¶ 15 Appellant argues that a more explicit instruction was necessary because the prosecutor misstated the law of negligence during closing argument. Even assuming *arguendo* that the prosecutor misstated the law, an explicit instruction from the court was not necessary. The trial court instructed the jury that it should look to the court, not the attorneys, for an accurate statement of the law. *Id.* at 532–533, 547–548. Juries are presumed to follow the court's instructions. *Commonwealth v. Spotz*, 587 Pa. 1, 896 A.2d 1191, 1224 (2006). Since the trial court's charge clearly, adequately, and accurately reflected the law, the charge was proper. Appellant's third claim fails.

¶ 16 Appellant's fourth, fifth, and sixth issues challenge the sufficiency of the evidence. This Court set forth our standard of review and the relevant substantive law as follows:

The standard we apply when reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced is free to believe all, part or none of the evidence. Furthermore, when reviewing a sufficiency claim, our Court is required to give the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

However, the inferences must flow from facts and circumstances proven in the record, and must be of such volume and quality as to overcome the presumption of innocence and satisfy the jury of an accused's guilt beyond a reasonable doubt. The trier of fact cannot base a conviction on conjecture and speculation and a verdict which is premised on sus-

picion will fail even under the limited scrutiny of appellate review.

*Commonwealth v. Matthews,* 870 A.2d 924, 928–929 (Pa.Super.2005) (*en banc*) (citations, quotations and ellipses omitted), *affirmed sub nom., Commonwealth v. Matthew,* 589 Pa. 487, 909 A.2d 1254 (2006).

¶ 17 Appellant contends that he did not possess the requisite level of intent to convict him of aggravated assault or REAP. Essentially, Appellant argues that the Commonwealth failed to prove beyond a reasonable doubt that he knew the risk of harming the child, and then consciously disregarded that risk.

¶ 18 The Crimes Code defines the offense of aggravated assault as follows:

A person is guilty of aggravated assault if he attempts to cause serious bodily injury to another or causes such injury intentionally, knowingly or recklessly under the circumstances manifesting extreme indifference to the value of human life.

18 Pa.C.S.A. § 2702(a)(1).

¶ 19 REAP is defined as follows:

A person commits a misdemeanor of the second degree if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury.

18 Pa.C.S.A. § 2705. "Reckless endangerment is a lesser included offense of aggravated assault and where the evidence is sufficient to support a claim of aggravated assault it is also sufficient to support a claim of recklessly endangering another person." *Commonwealth v. Thompson,* 559 Pa. 229, 739 A.2d 1023, 1028 n. 13 (1999).

¶ 20 "Recklessly" is defined as follows:

A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S.A. § 302(b)(3).

¶ 21 This Court has held that a heightened degree of recklessness, akin to malice in a murder case, is required for aggravated assault convictions:

Where, as here, the victim suffered serious bodily injury, the Commonwealth may establish the *mens rea* element of aggravated assault with evidence that the assailant acted either intentionally, knowingly, or recklessly.

. . .

To prevail on a theory of recklessness, the Commonwealth must show an assailant's recklessness rose to the level of malice, a crucial element to sustain a conviction for aggravated assault. *Commonwealth v. Kling,* 731 A.2d 145 (Pa.Super.1999). "Malice" was explained in *Kling:*

Malice exists where there is a wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured. Where malice is based on a reckless disregard of consequences, it is not sufficient to show mere recklessness; rather, it must be shown the defendant consciously disregarded an unjustified and extremely high risk that his actions might cause death or serious bodily injury. *See Commonwealth v. Scales,* 437 Pa.Super. 14, 648 A.2d 1205, 1207 (Pa.Super.1994), *ap-*

*peal denied,* 540 Pa. 640, 659 A.2d 559 (1995) (regarding third degree murder). A defendant must display a conscious disregard for almost certain death or injury such that it is tantamount to an actual desire to injure or kill; at the very least, the conduct must be such that one could reasonably anticipate death or serious bodily injury would likely and logically result. *See [Commonwealth v.] O'Hanlon,* [539 Pa. 478,] 653 A.2d [616] at 618 [(1995)] (regarding aggravated assault).

*Kling,* 731 A.2d at 147–48.

The circumstances showing intent to cause serious bodily injury apply with equal force to prove recklessness to a degree that one would reasonably anticipate serious bodily injury as a likely and logical result.

*Commonwealth v. Bruce,* 207 Pa.Super. 4, 916 A.2d 657, 663–664 (2007), *appeal denied,* 593 Pa. 754, 932 A.2d 74 (2007).

¶ 22 In *Commonwealth v. Hardy,* 918 A.2d 766 (Pa.Super.2007), appeal denied, 940 A.2d 362 (Pa.2008), this Court recently held that the evidence was sufficient to support a conviction for third-degree murder where the Commonwealth presented evidence that the defendant grabbed his infant son with enough force to fracture his ribs, shook him violently, and/or caused his head to strike a hard object, causing the baby's death. We wrote that this evidence "constituted not merely ill-will but, rather, wickedness of disposition, hardness of heart, recklessness of consequences, and a mind regardless of social duty—*i.e.,* malice necessary to support Appellant's murder conviction." *Id.* at 774.

¶ 23 When viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, the record reflects that there was sufficient evidence to support a conviction for aggravated assault. Dr. Dias, a pediatric neurosurgeon, testified that the child incurred a severe, potentially life-threatening significant injury to the brain and to the head. N.T., 10/4/2005, at 256. Dr. Dias further indicated that the injuries suffered by the child were not the type caused by "playful shaking," but were caused by "violent infant shaking." *Id.* Dr. Dias came to this conclusion to a reasonable degree of medical certainty. *Id.* at 256–257.

¶ 24 Again, nothing more than common sense is needed to know that the violent shaking of an infant child provides for a substantial and unjustifiable risk of serious bodily injury. Violently shaking the child in light of such an obvious risk goes far beyond mere criminal negligence, to malice. Given the evident force of the shaking and the enormous difference in size and strength between Appellant and the child, the Commonwealth did prove a heightened degree of recklessness beyond a reasonable doubt. *Hardy.*

¶ 25 Appellant's arguments to the contrary are unavailing. First, he suggests that he was not aware of the dangers of shaking a baby, because most people either do not know or tend to forget about Shaken Baby Syndrome. Next, he contends that there "was no evidence as to [Appellant's] actual conduct," presumably because there were no eyewitnesses to the assault. Finally, Appellant argues that there is no "reliable data" as to the minimum number of shakes necessary to cause Shaken Baby Syndrome, particularly where the infant has a larger than normal head. Appellant's Brief at 37–38.

¶ 26 These contentions lack merit because they construe the evidence in the light most favorable to Appellant, rather than the Commonwealth. Direct proof of Appellant's subjective thought process is unnecessary, because the Commonwealth

may prove its case through circumstantial evidence. *Matthews.* Given the medical testimony supporting a finding of a violent infant shaking, we fail to see how a lack of eyewitnesses should operate in Appellant's favor. We also stress that the issue is not, strictly speaking, whether Appellant was aware of a particular medical phenomenon known as Shaken Baby Syndrome. Rather, the question is simply whether Appellant acted recklessly to a degree that one would reasonably anticipate some serious bodily injury as a likely and logical result of his actions. *Bruce.* As noted above, the Commonwealth proved this element beyond a reasonable doubt.

¶ 27 Finally, we turn to the offense of EWOC. The Crimes Code defines this offense as follows:

> A parent, guardian, or other supervising the welfare of a child under 18 years of age commits an offense if he knowingly endangers the welfare of a child by violating a duty of care, protection or support.

18 Pa.C.S.A. § 4304(a). The Crimes Code defines knowingly as follows:

> A person acts knowingly with respect to a material element of an offense when: (i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and (ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

18 Pa.C.S.A. § 302(b)(2).

¶ 28 We have employed a three-prong standard to determine whether the Commonwealth's evidence is sufficient to prove this element of intent: (1) the accused must be aware of his or her duty to protect the child; (2) the accused must be "aware that the child is in circumstances that could threaten the child's physical or psychological welfare"; and (3) the accused either must have failed to act, or must have taken "action so lame or meager that such actions cannot reasonably be expected to protect the child's welfare." *Commonwealth v. Retkofsky,* 860 A.2d 1098, 1099–1100 (Pa.Super.2004).

¶ 29 Appellant argues that the Commonwealth's evidence does not satisfy the second prong. Specifically, he suggests that since he was not instructed by his doctor about the dangers of Shaken Baby Syndrome [5] around the time of the child's birth, he was at most criminally negligent.

¶ 30 We disagree. The "knowing" element of the crime applies to the general issue of whether the defendant knew that he was endangering the child's welfare, not whether the defendant knew that he would cause any particular result. For example, in *Commonwealth v. Passarelli,* 789 A.2d 708, 716 (Pa.Super.2001), the Commonwealth presented evidence that the defendant was entrusted with the care of a child, whom he intentionally shook or struck on the side of the head. In ruling that the evidence was sufficient for EWOC, we wrote that "the act that [the defendant] performed on [the victim] was not designed to protect, care or support [the victim]."

¶ 31 It takes nothing more than common sense for an adult, let alone an experienced father such as Appellant,[6] to know that

---

5. "A diagnosis of 'Shaken [Baby] Syndrome' simply indicates that a child found with the type of injuries described above has not suffered those injuries by accidental means. Thus, such expert testimony shows that the

child was intentionally, rather than accidentally injured." *Passarelli,* 789 A.2d at 715.

6. This is Appellant's second child.

violently shaking an infant child with enough force to cause an abusive head trauma could threaten the child's physical and/or psychological welfare. Thus, there was sufficient evidence to support the jury's decision that Appellant knowingly violated a duty of care, protection or support. *Passarelli*. Accordingly, we affirm the judgment of sentence in part, vacate the judgment of sentence insofar as it pertains to restitution, and remand for further restitution proceedings.

¶ 32 Judgment of sentence affirmed in part and vacated in part. Remanded for further proceedings. Jurisdiction relinquished.

¶ 33 FORD ELLIOTT, P.J., STEVENS, ORIE MELVIN, BENDER, BOWES, GANTMAN and SHOGAN, JJ. join the Majority Opinion.

¶ 34 KLEIN, J. files a Concurring Statement in which BOWES, J. joins.

## CONCURRING STATEMENT BY KLEIN, J.:

¶ 1 I fully agree with and join the opinion of my distinguished colleague. I write separately to note my view that upon remand certain factors must be taken into consideration when determining the amount of the restitution. Under the restitution statute,[7] it is the obligation of the trial judge to fix a number for restitution, not merely to impose a cap. The restitution statute states that "the court *shall specify the amount and method* of restitution." 18 Pa.C.S.A. § 1106(c)(2) (emphasis added). Here, the court ordered restitution *up to a maximum* of $1,481,562.54, which was later reduced to $1,472,942.59. It did not specify an amount. This is essentially an order of restitution "to be determined later," and is "illegal." *Maria-*

*ni*, 869 A.2d 484, 486 (Pa.Super.2005). Further, under 18 Pa.C.S.A. § 1106(c)(3), the court may modify the restitution amount if circumstances change. A fixed amount based on the evidence is necessary at the time that restitution is ordered, and the Commonwealth is free to seek modification under section 1106(c)(3) as necessary.

¶ 2 However, in considering future restitution, it is not enough merely to look at a table of life expectancy. The court must consider the individual's unique life expectancy. In this case, both the prior medical condition of the child and his present medical condition may well shorten his life expectancy. Just as in civil cases, it takes expert testimony to compute the life expectancy of a person of a given age *with given medical conditions*. When actuarial tables are submitted in a personal injury case, the jury must be permitted to consider individual characteristics that impact on the injured party's life expectancy. *Kraus v. Taylor*, 710 A.2d 1142 (Pa.Super.1998): *Helm v. Eagle Downs–Keystone Racetrack*, 385 Pa.Super. 550, 561 A.2d 812, 813 (1989). In a wrongful death case, a jury must consider the decedent's prior health, habits, occupations, surroundings, and other elements likely to operate for or against longevity, including the decedent's mode of life, disabilities, and similar matters. *See Rowles v. Evanuik*, 350 Pa. 64, 38 A.2d 255 (1944); *Labrador v. City of Philadelphia*, 134 Pa.Cmwlth. 427, 578 A.2d 634 (1990); *see also Corrado v. Thomas Jefferson University Hosp.*, 790 A.2d 1022 (Pa.Super.2001). Similarly, when setting a reasonable amount of restitution, the court should consider any relevant evidence that impact life expectancy.

¶ 3 Likewise, it is not appropriate to compute future medical expenses merely by taking the cost of the first year of

7. 18 Pa.C.S.A. § 1106.

treatment and multiplying that number by the life expectancy. The restitution amount must be determined by considering the likely expenses in the future, which could very well be more or less than the first year costs. Here, the $20,000 figure accepted by the court was based on the child's treatment for the first year of care, although the treatment for the two most recent years had averaged $13,000 per year. *See* Commonwealth Exhibits 1 and 2. Once again, to estimate future treatment, it is necessary to have expert testimony.