J-A30005-16

2017 PA Super 126

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| v. | |
| ANGELA D. BIESECKER | |
| Appellant | No. 318 MDA 2016 |

Appeal from the Judgment of Sentence September 18, 2015
In the Court of Common Pleas of Berks County
Criminal Division at No(s): CP-06-CR-0003502-2013

BEFORE:  BOWES, OLSON AND STABILE, JJ.

OPINION BY BOWES, J.:                          **FILED APRIL 26, 2017**

Angela Biesecker appeals from the judgment of sentence of five years probation imposed following her convictions for Medicaid fraud, theft by deception, and receipt of stolen property.  We affirm.

Appellant's adult son, E.B., who is deaf and autistic, qualified for government assistance through Medicaid.[1]  A provision in the law, referred to at trial as an OBRA[2] waiver, permits funds that would otherwise go towards care at an institutional facility to be paid to caregivers who provide

---

[1] **See Colonial Park Care Ctr., LLC v. Dep't of Pub. Welfare**, 123 A.3d 1094 (Pa.Cmwlth. 2015) ("Medicaid provides federal financial assistance to states choosing to reimburse needy individuals for certain medical expenses.")

[2] The acronym apparently refers to the federal Omnibus Budget and Reconciliation Act.

services at the client's residence or out in the community. The Commonwealth prosecuted Appellant for receiving funds that she was not entitled to under these programs.

The record indicates that E.B. first applied for an OBRA waiver in June of 2007 from the Cerebral Palsy Association of Chester County (hereinafter "CPA"), a Medicaid support agency. Kimberly Sharpe, the supervisor of adult and community services at the CPA, testified that the chosen support agency coordinated caregiving services. Appellant, E.B., and Ms. Sharpe jointly prepared an individual service plan ("ISP"), which set forth specific goals tailored to E.B.'s needs. The major goal was community integration, which is designed to develop the client's skills "in order to live more independently in the community." N.T., 7/7-10/15, at 311. "[W]hat you're trying to do is improve quality of life, enable [participants] to go back out into the community and be able to adequately communicate and assimilate without being trapped [in a facility]." *Id*. at 464. Activities that qualified as community integration are correspondingly quite broad. Examples mentioned at trial included learning how to purchase ingredients and prepare a meal, balancing a checkbook, learning hygiene, using public transportation, ordering food, and enjoying recreational and leisure activities. Integration remained the primary goal for subsequent ISPs prepared for June 1, 2008 through June 30, 2009, and July 1, 2009 to June

30, 2010. Appellant was present for meetings regarding the ISPs. *Id*. at 318-19.

ISPs were submitted to the Commonwealth's Department of Public Welfare for funding authorization. *Id*. at 461-62. Once approved, the support agency was permitted to bill the Commonwealth for the specified amounts each month. *Id*. at 523. The support agency did not actually provide the caregiving services, however. The participant chose from a list of approved agencies to provide the services listed in the ISP. *Id*. at 314. E.B.'s ISP specified that he was to receive services from two agencies: Caring Companions and The Arc of Chester County ("the Arc"). These agencies then billed the support agency as authorized by the ISP.

The dispute in this case focused on the time period spanning July 1, 2009 to June 30, 2010, as the Commonwealth eventually learned that Caring Companions, which employed Appellant, and the Arc, which did not employ Appellant, billed CPA for services performed at the same times.

Caring Companions employed Appellant as E.B.'s caregiver.[3] Appellant, like all employees who provided caregiving services, received an hourly salary. When hired, employees were instructed to list the start time

---

[3] The record does not clearly indicate when Appellant was first employed by Caring Companions; however, her employment began prior to the charged events. Presumably, Appellant was hired in 2008 following the approval of the June 1, 2008 ISP.

and end time for the periods services were rendered, as that was the basis for billing. *Id*. at 114. Marisol Alvarez, the director of operations for Caring Companions, testified that all new employees received training, which included how to fill out timesheets. *Id*. at 113-14. Another employee, Sheri Willman, testified that employees were instructed to list the actual hours that services were provided. Thus, if a caregiver actually provided services from 9:00 a.m. to 12:00 p.m., the employee was not permitted to list 6:00 p.m. to 9:00 p.m. *Id*. at 168. Appellant's timesheets generally listed large blocks of time that lacked detail and progress notes. Ms. Alvarez stated that the company relied "on the honor system . . . since [she] was the mother of the client." *Id*. at 111.

The Arc also provided services to E.B., commencing on or about July 1, 2009. Employees testified to the services they provided and authenticated timesheets detailing their care and progress notes from July of 2009 through July of 2010. *Id*. at 193-214; 238-48. These sessions were largely one-on-one and Appellant was not providing services at those times.

In December of 2009, Ms. Sharpe reviewed timesheets from both agencies and realized that CPA was being double billed. *Id*. at 330. She sent letters to both agencies requesting confirmation that services were provided. *Id*. at 331-32. Ms. Sharpe also contacted the Department of Welfare. *Id*. at 335. In April of 2010, the number of authorized hours was reduced due to the double billing. *Id*. at 334. The Arc, which was

- 4 -

previously authorized to provide services for thirty hours a week, was reduced to fifteen hours. Caring Companions, which was authorized to bill for forty hours a week, was reduced to twenty-five hours. *Id*. at 334, 1383 (Commonwealth's Exhibit 43).

Agent Luis Gomez from the Medicaid Fraud Control unit testified at trial and explained that he compared timesheets submitted by Appellant to Caring Companions against timesheets submitted by the Arc for the time period spanning July 1, 2009 to June 30, 2010. *Id*. at 530. For these dates, Caring Companions billed 1,843 total hours, 608.25 of which overlapped with hours billed by the Arc. Agent Gomez calculated that the Department of Public Welfare paid out $10,926.80 for the 608.25 hours of overlap. The charges herein pertained only to the overlapping hours.

The Commonwealth also introduced evidence regarding developments in E.B.'s care following the period of double billing. Sometime during the summer of 2010, Appellant contacted Cathy Stein, the owner of Provider of Co-Op Services, regarding care for E.B. *Id*. at 435. Ms. Stein hired Appellant's daughter to provide services to E.B. These services commenced July 1, 2010 and ended in September of 2011. *Id*. at 429, 454. The daughter submitted timesheets for these time periods claiming that she provided services to E.B. from 12:00 p.m. to 8:00 p.m. *Id*. However, she was employed as a medical assistant for a doctor's office during this same timeframe, and the manager for that office confirmed that the daughter

worked 8:30 a.m. to 5:00 p.m. during the week from September of 2010 to May of 2011. *Id*. at 422-23. Thus, these services were not provided, at a minimum, during the hours of 12:00 p.m. to 5:00 p.m. The daughter was paid almost $28,000 for these services, approximately $23,000 of which was transferred to Appellant's bank account from August 25, 2010, through June 15, 2011. *Id*. at 526-28.

Appellant testified in her defense. She stated that CPA refused to pay for communication support for E.B. and referred Appellant to Caring Companions, since that agency would hire family members as caregivers. *Id*. at 610-11. She stated that, with respect to training, Caring Companions simply told her that she was E.B.'s mother and knew what to do. *Id*. at 613. She agreed that she submitted timesheets that did not specifically list which community integration tasks she performed with E.B. However, she explained that Caring Companions neither trained nor required her to do so, and said it was not feasible for her to list all the activities in detail due to her dual role of mother and caregiver. She agreed that the Commonwealth was double billed but reiterated that she did not have a specific schedule and said she was instructed to spread the allocated hours over the course of the week. *Id*. at 654.

The jury returned guilty verdicts at all three counts. Appellant timely appealed and presents the following issues for our review.

I.      Was the evidence insufficient to prove beyond a reasonable doubt that the Defendant committed Medical Assistance Fraud, Theft By Deception and Receiving Stolen Property?

II.     Did the Trial Court abuse its discretion in denying the Defense's Motion in *Limine* to exclude evidence of alleged medical assistance fraud purported by the Defendant's daughter subsequent to Defendant's alleged fraudulent activity?

III.    Did the Court abuse its discretion in denying the Defendant's motion for a mistrial after the Attorney General questioned the Defendant regarding increased security required at a government office due to the Defendant's alleged behavior?

IV.     Were the verdicts against the weight of the evidence?

Appellant's brief at 4.

Appellant's first issue challenges the sufficiency of the evidence for all three convictions. Whether the evidence was sufficient to support the conviction presents a matter of law; our standard of review is *de novo* and our scope of review is plenary. **Commonwealth v. Walls**, 144 A.3d 926, 931 (Pa.Super. 2016) (citation omitted). In conducting our inquiry, we

> examine whether the evidence admitted at trial, and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, support the jury's finding of all the elements of the offense beyond a reasonable doubt. The Commonwealth may sustain its burden by means of wholly circumstantial evidence.

**Commonwealth v. Doughty**, 126 A.3d 951, 958 (Pa. 2015).

Appellant's brief states that the elements challenged at each conviction largely overlap. "As [Appellant] is contesting the Commonwealth presenting evidence sufficient to prove elements similarly required by all three statutes,

the analysis will be consolidated." Appellant's brief at 32. Before turning to the individual statutes, we review Appellant's argument.

Appellant's overarching claim is that the Commonwealth failed to establish the requisite intent. She concedes that her timesheets were inaccurate and that she billed for services that she did not actually provide during those times. "The Commonwealth proved beyond a reasonable doubt that her timesheets were an inaccurate accounting of when she worked." Appellant's brief at 35. Appellant contends, however, that she actually **did** perform those services; she simply performed them at times other than those reflected on the timesheets submitted to Caring Companions. Hence, since she provided integration services to E.B. at other times, she was lawfully entitled to the compensation.

Having established Appellant's argument, we now examine the elements of the crimes. We begin with the Medicaid fraud crime, which states:

(a) It shall be unlawful for any person to:

> (1) Knowingly or intentionally present for allowance or payment any false or fraudulent claim or cost report for furnishing services or merchandise under medical assistance, or to knowingly present for allowance or payment any claim or cost report for medically unnecessary services or merchandise under medical assistance, or to knowingly submit false information, for the purpose of obtaining greater compensation than that to which he is legally entitled for furnishing services or merchandise under medical assistance, or to knowingly submit false

> > information for the purpose of obtaining authorization for furnishing services or merchandise under medical assistance.

62 P.S. § 1407(a)(1). Hence, the applicable *mens rea* is "knowingly **or** intentionally." (emphasis added). There is a significant difference between these two mental states, and the Commonwealth need not show both. *Compare Commonwealth v. Scolieri*, 813 A.2d 672 (Pa. 2002) (analyzing criminal statute that required proof of knowing **and** intentional conduct). The Crimes Code defines the two as follows:

> **(b) Kinds of culpability defined.—**
>
> > (1) A person acts intentionally with respect to a material element of an offense when:
> >
> > > (i) if the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause such a result; and
> > >
> > > (ii) if the element involves the attendant circumstances, he is aware of the existence of such circumstances or he believes or hopes that they exist.
> >
> > (2) A person acts knowingly with respect to a material element of an offense when:
> >
> > > (i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and
> > >
> > > (ii) if the element involves a result of his conduct, he is aware that it is practically

>                certain that his conduct will cause such a
>                result.

18 Pa.C.S. § 302. Appellant does not specify whether (2)(i), (2)(ii), or both apply. For the following reasons, we find that both are met since Appellant knowingly submitted the timesheets (the conduct) and knew payment would occur (the result).

Appellant argues that she did not knowingly or intentionally commit this offense because the definition of community integration services is quite broad, and includes a number of tasks that comfortably fit under the umbrella of skills regularly taught to children by their parents. Thus, she argues, since those parental tasks would clearly qualify as community integration services if performed by a third party, she was similarly entitled to submit claims for those services. Building on this premise, Appellant asks us to find that she was entitled to the funds because she actually did provide community integration services, albeit at times other than those listed on the timesheets. We also take heed of Appellant's plea that minutely accounting for each of these tasks on the timesheets would be quite difficult.

Appellant's arguments would be more forceful if the Commonwealth sought to hold her criminally liable for each hour that she submitted under these programs. However, the Commonwealth limited its prosecution to the 608.25 hours that Appellant billed for services that were actually performed by the Arc from July 1, 2009 through June 30, 2010. We recognize

Appellant's argument that, upon E.B.'s return home following Arc activities, Appellant could have provided additional community integration tasks. However, that does not explain why Appellant did not submit **accurate** timesheets that reflected those services, and the Commonwealth presented evidence that Appellant was trained on the proper procedures.

Moreover, the Commonwealth presented evidence that suggested she did not, in fact, provide those services during other time periods. Significantly, Appellant agreed that she billed Caring Companions for caregiving services when E.B. was on a trip with the Arc in New Jersey, when she could not have possibly provided caregiving services. The Commonwealth specifically highlighted a recreational trip to Wildwood, New Jersey. Lori Meyers, an employee of the Arc, testified that E.B. accompanied Ms. Meyers on a weekend trip to Wildwood from July 10, 2009 to July 12, 2009. *Id*. at 269. Appellant was not present. The Arc timesheets billed for the entire weekend, including the overnight stay in New Jersey. However, Appellant also submitted timesheets for those time periods.

Additionally, our precedents permit the consideration of common sense in determining whether an actor has acted knowingly as specified in § 302. In **Commonwealth v. Smith**, 956 A.2d 1029 (Pa.Super. 2008), we reviewed a challenge to the sufficiency of the evidence for endangering the welfare of a child, which required proof that the actor knowingly performed an act that "could threaten the child's physical or psychological welfare." **Id**.

- 11 -

at 1038. The infant victim exhibited signs of Shaken Baby Syndrome. The appellant claimed that doctors did not specifically instruct him about the dangers of shaking a baby. We quickly disposed of that claim. "It takes nothing more than common sense for an adult, let alone an experienced father such as [a]ppellant, to know that violently shaking an infant child with enough force to cause an abusive head trauma could threaten the child's physical and/or psychological welfare." *Id*. at 1038–39. Similarly, it is common sense that billing an agency for work one did not actually perform could result in overpayment. There is little logical reason to submit over 600 hours of timesheets for work that was not performed during the hours specified.

Thus, we find that the Commonwealth provided sufficient evidence for the jury to conclude that Appellant "knowingly . . . submit[ted] false information, for the purpose of obtaining greater compensation than that to which [s]he is legally entitled for furnishing services or merchandise under medical assistance." 62 P.S. § 1407(a)(1). She was not legally entitled to be paid for services performed by other persons, and we therefore affirm the conviction at this count.

We likewise find the convictions for theft by deception and receipt of stolen property were supported by sufficient evidence. The crime of theft by deception states:

**(a) Offense defined.**--A person is guilty of theft if he intentionally obtains or withholds property of another by deception. A person deceives if he intentionally:

> (1) creates or reinforces a false impression, including false impressions as to law, value, intention or other state of mind; but deception as to a person's intention to perform a promise shall not be inferred from the fact alone that he did not subsequently perform the promise;

. . . .

18 Pa.C.S. § 3922. Finally, the crime of receipt of stolen property reads:

**(a) Offense defined.**--A person is guilty of theft if he intentionally receives, retains, or disposes of movable property of another knowing that it has been stolen, or believing that it has probably been stolen, unless the property is received, retained, or disposed with intent to restore it to the owner.

18 Pa.C.S. § 3925.

The property in both cases is the funds paid by the Commonwealth. Unlike the medical care fraud crime, both of these statutes require proof of intentional conduct. Appellant's argument that the Commonwealth failed to meet its burden largely repeats the points set forth above.

We find that the convictions were supported by sufficient evidence. The Commonwealth is permitted to establish intent through circumstantial means. "As intent is a subjective frame of mind, it is of necessity difficult of direct proof. Accordingly, we recognize that '[i]ntent can be proven by direct or circumstantial evidence; it may be inferred from acts or conduct or from the attendant circumstances.'" *Commonwealth v. Matthews*, 870 A.2d 924, 929 (Pa.Super. 2006) (citations omitted).

- 13 -

The following circumstances are relevant to our finding. First, Appellant's submission of over 600 hours of services that she did not actually provide suggests, as a matter of common sense as discussed *supra*, that her aim was to defraud. Second, Agent Gomez testified that, during the arraignment process Appellant stated, "When my son wakes up at 3:00 in the morning screaming and I have to take care of him, why shouldn't I get paid for that?" N.T., 7/7-10/15, at 561. Third, the Commonwealth presented evidence of medical assistance fraud committed by Appellant's daughter, and showed that approximately $23,000 of those proceeds were transferred to Appellant after the double billing stopped. This evidence was powerful proof of intent in that it tends to negate the argument that she mistakenly believed she was entitled to receive the funds at issue. The jury could properly infer Appellant was involved in this scheme given the timing, familial relationship, and transfer of money. The scheme established that Appellant intentionally submitted the instant inaccurate timesheets for fraudulent purposes. The timesheets created a false impression which resulted in overpayment. We therefore find that sufficient evidence was presented to uphold these two convictions.

The transfer of money segues into Appellant's second issue on appeal, a claim that the trial court abused its discretion in denying her motion *in limine* seeking exclusion of these acts. Our review of a trial court's evidentiary rulings applies the following standard.

> The admissibility of evidence is solely within the discretion of the trial court and will be reversed only if the trial court has abused its discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record.

*Commonwealth v. Mickel*, 142 A.3d 870, 874 (Pa.Super. 2016). Pa.R.E. 404 governs the admissibility of this evidence.

> Under the Pennsylvania Rules of Evidence, evidence of other bad acts or crimes that are not currently being prosecuted against the defendant are not admissible against the defendant to show his bad character or propensity to commit criminal acts. However, evidence of other [acts] may be admissible where that evidence is used for some other purpose. Such purposes explicitly include "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Rule 404(b)(2).

*Commonwealth v. Diehl*, 140 A.3d 34, 41 (Pa.Super. 2016) (citations omitted). Evidence is admissible for these other purposes "only if the probative value of the evidence outweighs its potential for unfair prejudice." Pa.R.E. 404(b)(2). "To be admissible under this exception, there must be a specific 'logical connection' between the other act and the crime at issue which establishes that the crime currently being considered grew out of or was in any way caused by the prior set of facts and circumstances." *Commonwealth v. Cox*, 115 A.3d 333, 337 (Pa.Super. 2015) (*en banc*).

Appellant challenges the logical connection between the two acts, stating that Appellant's link to her daughter's fraud[4] is tenuous. We disagree. As explained *supra*, there is a clear logical and temporal relationship between the acts and the crimes charged. Therefore, the trial court did not abuse its discretion in admitting the evidence.

Appellant's third argument on appeal assails the failure of the trial court to declare a mistrial at Appellant's request. This motion was made after the Commonwealth asked Appellant, on cross-examination, whether she knew that the CPA added security to their facility due to Appellant's past behavior. The judge sustained the objection but denied a mistrial request, and Appellant did not ask for a curative instruction.

We find no abuse of discretion. A mistrial is not required simply because the prosecutor makes an improper remark.

> Initially we note that the decision whether to declare a mistrial is within the sound discretion of the trial judge and will not be reversed absent a flagrant abuse of discretion. The granting of such a motion is not required in all situations where the language of the district attorney is intemperate, uncalled for or improper. Prosecutorial comments will constitute reversible error only where the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility

---

[4] Appellant labels the evidence as fraudulent. We note that Appellant's daughter was separately charged in another county for her acts. The prosecutor informed the court that he did not join these cases for trial due to the fact that he extended an offer of ARD to the daughter. N.T., 7/7-10/15, at 18.

toward the defendant so that they could not weigh the evidence objectively and render a true verdict.

*Commonwealth v. Cottam*, 616 A.2d 988, 997 (Pa.Super. 1992). We do not find that the comments meet this lofty standard.

Appellant's final issue attacks the weight of the evidence. Our standard of review is well-settled. We review the exercise of the trial court's discretion in ruling on the weight claim, not the underlying question of whether the verdict is against the weight of the evidence. *Commonwealth v. Leatherby*, 116 A.3d 73, 82 (Pa.Super. 2015) (citing *Commonwealth v. Brown*, 23 A.3d 544, 558 (Pa.Super. 2011)). "One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice." *Id*. at 82.

Instantly, Appellant claims that the evidence met this high standard because the evidence strongly suggests that Appellant provided the services for which she was paid and is guilty of nothing more than inappropriate record keeping. However, this argument ignores the evidence that Appellant did, in fact, receive training on proper timesheet procedures and ignores the common sense notion that an employee must accurately report the actual hours worked.

The jury was entitled to weigh all evidence presented in considering Appellant's alternative theory as set forth in her own testimony.

***Commonwealth v. Sanders***, 627 A.2d 183, 187-88 (Pa.Super. 1993).

Hence, we find that the trial court did not abuse its discretion in determining

the verdicts were not against the weight of the evidence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>4/26/2017</u>