J-A04018-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LUIS FRANCISCO QUINONES | : | |
| | : | |
| Appellant | : | No. 780 MDA 2025 |

Appeal from the Judgment of Sentence Entered May 27, 2025
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s):  CP-22-CR-0000921-2020

BEFORE:  PANELLA, P.J.E., KING, J., and LANE, J.

MEMORANDUM BY KING, J.:                    **FILED: FEBRUARY 19, 2026**

Appellant, Luis Francisco Quinones, appeals from the judgment of sentence entered in the Dauphin County Court of Common Pleas, following his jury trial convictions for third-degree murder and endangering the welfare of children ("EWOC").[1]  We affirm.

The relevant facts and procedural history of this matter are as follows. In 2019, Kujuanna McBride and Appellant were involved in a romantic relationship.  Appellant often babysat Ms. McBride's infant son, J.P.  On October 19, 2019, Appellant, Ms. McBride, and the 8-month-old J.P. checked into a hotel room.  Ms. McBride went out with her sister and left J.P. in the care of Appellant.  When Ms. McBride was late returning to the hotel, Appellant became angry and stated that he was going to "fuck her up" and leave J.P.

---

[1] 18 Pa.C.S.A. §§ 2502(c) and 4304, respectively.

alone in the hotel room. Appellant later apologized for sending the messages and reconciled with Ms. McBride.

On October 20, 2019, Ms. McBride, Appellant, and J.P. checked into another hotel room in Swatara Township. Ms. McBride again left J.P. in Appellant's care while she went out with her sister. Ms. McBride stayed in contact with Appellant throughout the night. At 10:22 p.m., Appellant sent Ms. McBride a picture of J.P. with a fixed stare, distended stomach, and propped up against some pillows. Appellant stated that the baby was asleep.

On October 21, 2019, at 12:31 a.m., Appellant texted and then called Ms. McBride and told her J.P. was not breathing. Ms. McBride rushed back to the hotel and found J.P., naked from the waist down, on the bed and in obvious medical distress. Ms. McBride took J.P. to the hotel lobby, where bystanders attempted to assist her with performing CPR and calling 911. Police and paramedics responded to the scene where they discovered J.P., who was cold to the touch and had blood coming out of his nose. An officer performed CPR until EMS arrived and took over life-saving efforts. EMS transported J.P. to the hospital, where he was pronounced dead at 1:29 a.m.

Appellant was detained due to a parole warrant. During the course of interviews with police, Appellant at first denied having harmed J.P. Appellant claimed that he had bathed J.P. and prepared him for bed, and that J.P. threw up after having a bottle. Appellant stated that he changed J.P.'s clothing and that when he checked J.P. a short time later, J.P. had "white stuff" on his mouth and he was limp.

- 2 -

While interviews with Appellant were ongoing, on October 22, 2019, an autopsy revealed that J.P.'s cause of death was complications from asphyxia and traumatic brain and spinal cord injuries. J.P. had also suffered numerous internal injuries. The manner of death was declared as homicide.

On October 23, 2019, detectives had Appellant perform a reenactment of the events in the hotel room on the night of J.P.'s death. Appellant demonstrated filling the tub, giving J.P. a bath, and putting him to bed. Appellant claimed that this is when he took the photo of J.P. Appellant stated that J.P. fell asleep and when he checked on him, the child was limp. Appellant stated that he attempted CPR and an unknown substance came out of J.P.'s nose.

After detectives confronted Appellant with inconsistencies in his interview and with the autopsy results, Appellant amended his story. Ultimately, Appellant admitted that after the bath, he turned around to prepare food for himself and during that time, J.P. fell off the bed. Appellant stated that after J.P. fell, he attempted to pick J.P. up from the floor, and J.P. fell again and hit his head. Appellant admitted that he might have shaken J.P. or gripped his head tighter than he had realized.

A third and final interview was conducted at the Susquehanna Township Police Department, where Appellant maintained the same version of events but ultimately admitted that he had grabbed J.P. by the head and that Appellant had been frustrated, nervous, and panicked while holding J.P.'s head. Appellant stated that he had been rougher than he realized. The

Commonwealth subsequently charged Appellant with criminal homicide and EWOC.

Following numerous delays, in January 2025, the matter proceeded to trial by jury. At trial, Dr. Wayne Ross, who performed J.P.'s autopsy, testified regarding his findings and conclusions, namely, that throwing or slamming a child would create the types of injuries present on J.P.'s body. Appellant presented an expert witness to contradict the Commonwealth's evidence. On January 30, 2025, the jury convicted Appellant of third-degree murder and EWOC.

On May 27, 2025, the court sentenced Appellant to an aggregate term of 20 to 40 years' incarceration. On May 31, 2025, Appellant timely filed a post-sentence motion. On June 4, 2025, the court denied Appellant's motion. On June 16, 2025, Appellant timely filed a notice of appeal. On June 20, 2025, the court ordered Appellant to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal. On July 7, 2025, Appellant timely complied.

On appeal, Appellant raises a single issue for our review:

> Did the Commonwealth fail to prove murder in the third degree, specifically that the killing was done with malice, beyond a reasonable doubt?

(Appellant's Brief at 5).[2]

In his sole issue, Appellant contends that the Commonwealth failed to prove beyond a reasonable doubt that the injuries caused to J.P. were inflicted

---

[2] Appellant does not challenge the sufficiency of the evidence to support his conviction for EWOC.

by Appellant, or that the injuries were inflicted with malice. Appellant asserts that the Commonwealth's argument is that, because the injuries led to death, Appellant must have inflicted them and must have acted with malice. Nevertheless, Appellant claims that this reasoning and the Commonwealth's evidence to support this theory is "speculative" at best. Appellant argues that ordinary recklessness is insufficient to constitute malice and that the Commonwealth established only that Appellant acted with ordinary recklessness amounting to manslaughter, not murder. Appellant emphasizes that he stated to police only that he **may** have shaken J.P. or that J.P. **might** have slipped or bumped his head. Appellant concludes the Commonwealth presented insufficient evidence to sustain his conviction for third-degree murder, and this Court must grant relief. We disagree.

In reviewing a challenge to the sufficiency of the evidence, our standard of review is as follows:

> As a general matter, our standard of review of sufficiency claims requires that we evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.
>
> The Commonwealth may sustain its burden by means of wholly circumstantial evidence. Accordingly, [t]he fact that

the evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence coupled with the reasonable inferences drawn therefrom overcomes the presumption of innocence. Significantly, we may not substitute our judgment for that of the fact finder; thus, so long as the evidence adduced, accepted in the light most favorable to the Commonwealth, demonstrates the respective elements of a defendant's crimes beyond a reasonable doubt, the appellant's convictions will be upheld.

**Commonwealth v. Sebolka**, 205 A.3d 329, 336-37 (Pa.Super. 2019) (quoting **Commonwealth v. Franklin**, 69 A.3d 719, 722-23 (Pa.Super. 2013)).

"Murder in the third degree is an unlawful killing with malice but without the specific intent to kill." **Commonwealth v. Dunphy**, 20 A.3d 1215, 1219 (Pa.Super. 2011). **See also** 18 Pa.C.S.A. § 2502(c) (defining third-degree murder as "all other kinds of murder," *i.e.*, those committed with malice that are not intentional (first-degree) or committed during perpetration of felony (second-degree)). Malice is defined as:

[A] wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured…. [M]alice may be found where the defendant consciously disregarded an unjustified and extremely high risk that his actions might cause serious bodily injury.

**Commonwealth v. DiStefano**, 782 A.2d 574, 582 (Pa.Super. 2001), *appeal denied*, 569 Pa. 716, 806 A.2d 858 (2002). "Malice may be inferred by considering the totality of the circumstances." **Dunphy, supra**.

In **Commonwealth v. Smith**, 956 A.2d 1029, 1037 (Pa.Super. 2008),

*appeal denied*, 605 Pa. 684, 989 A.2d 917 (2010), the defendant was accused of shaking a child and causing a severe, life-threatening injury to the brain and head. The Commonwealth presented the evidence of a pediatric neurosurgeon who concluded, within a reasonable degree of medical certainty, that the injuries were not the type caused by playful shaking, but violent infant shaking. This Court affirmed the defendant's judgment of sentence for aggravated assault,[3] observing, with respect to the prerequisite finding of malice:

> [N]othing more than common sense is needed to know that the violent shaking of an infant child provides for a substantial and unjustifiable risk of serious bodily injury. Violently shaking the child in light of such an obvious risk goes far beyond mere criminal negligence, to malice. Given the evident force of the shaking and the enormous difference in size and strength between Appellant and the child, the Commonwealth did prove a heightened degree of recklessness beyond a reasonable doubt.

*See id.* at 1037.

Instantly, the trial court found that the Commonwealth presented sufficient evidence to prove Appellant acted with malice. In so finding, the trial court first summarized the evidence provided by Dr. Ross:

> In addition to his autopsy and report, Dr. Ross also prepared two rebuttal reports in response to reports prepared by a forensic pathologist on behalf of Appellant. Dr. Ross excluded the child's medical history, including issues associated with the child's premature birth, as a contributor

_____

[3] The finding of malice required to prove the *mens rea* for third-degree murder and aggravated assault is the same. **See Commonwealth v. Frye**, 319 A.3d 602, 607 (Pa.Super. 2024), *appeal denied*, ____ Pa. ____, 336 A.3d 253 (2025).

to his death. Specifically, during the autopsy, Dr. Ross noted nothing, pathologically, between what occurred eight months earlier, when the child was born, and presently when the child died. Dr. Ross explained that his initial external review of the child revealed several things. He noted froth coming out of the child's nose, which indicated that the lungs were failing. He identified a linear contusion on the left side of the child's forehead, abrasions around the nose, a pinpoint hemorrhage to the left side of the nose, or swelling to the upper lip, bleeding to the upper frenulum, an abrasion on the upper frenulum, and petechial hemorrhages to the left distal chin.

Dr. Ross also noted that there was plethora noted to the head, neck and chest wall, explaining that this is a sign of asphyxia or a sign of acute respiratory depression. Dr. Ross also noted these compressions occurred during life because underneath the chest was bleeding. There was blood noted in the pancreas, kidney and liver. Dr. Ross explained this finding could only occur by the body being compressed. Dr. Ross also noted that petechial hemorrhages were found inside the lungs, thymus, and heart, which indicated the child had been subjected to asphyxia. Dr. Ross explained that the mechanism of injury was that "the child's chest was compressed down and body parts were compressed down to the point where it was sandwiched against the spine and there was so much trauma being sustained to this infant that it resulted in bleeding in those areas." Dr. Ross noted it would take hundreds of pounds of force to cause the injuries found. He further explained that the compression was different than that used to perform CPR. Additionally, Dr. Ross noted that when he viewed those areas under a microscope, white blood cells were present. This finding was significant because it indicated that the child was alive when the compression occurred.

Dr. Ross noted a small hemorrhage over the right top of the skull, most likely caused by contact force. Dr. Ross' examination revealed several injuries to the child's head, central nervous system and spinal cord. The injuries to the head included 13 fresh bruises to the scalp and bruises at the top of the head and all along the left side of the head. Dr. Ross also found subdural bleeding hemorrhages inside both sides over the right side of the brain and over the left

side of the brain. Dr. Ross also noted hemorrhages around the optic nerves. When Dr. Ross viewed the child's eyes under a microscope, he observed blood in both retinas which was consistent with severe compressive forces. Dr. Ross further explained a subdural hematoma is due to a severe deceleration injury.

Dr. Ross also noted a spinal cord injury, specifically, bleeding around the cervical region. Bleeding in this area would be caused by trauma due to shaking. Dr. Ross observed a hemorrhage along the left front side of the child's neck, consistent with a compression where the neck would be compressed against the spine. Dr. Ross opined that throwing or slamming a child would create the types of injuries present in the child. Dr. Ross also opined that the injuries present were beyond those that would occur with a shaken baby. Dr. Ross ultimately opined that the child's cause of death was complications of asphyxia and traumatic brain and spinal cord injury, and the manner of death was homicide.

(Trial Court Opinion, 8/12/25, at 7-9) (internal citations omitted).

Ultimately, the trial court concluded that the evidence was sufficient to support Appellant's conviction for third-degree murder, reasoning:

Viewing the evidence in the light most favorable to the Commonwealth as verdict winner, the Commonwealth presented substantial evidence that Appellant displayed a conscious disregard for an unjustified and extremely high risk that his actions might cause death or serious bodily harm. Here, although perhaps unintentional with regard towards killing the child, Appellant exhibited behaviors and actions that would most certainly pose a risk of serious bodily harm and death to a nine-month-old child. Appellant acknowledged that he felt a plethora of emotions, including frustration, while he was watching the child, especially when the child first fell while in his care. Further, the Commonwealth presented evidence, accepted by the jury, that the myriad of injuries sustained by the child would have been caused by extreme force and not by a simple, accidental fall.

(*See id.* at 9).

The record supports the court's conclusion. The jury was free to credit the testimony and evidence establishing that J.P. suffered catastrophic internal injuries that were not consistent with an accidental fall but the application of extreme force. (*See* N.T. Trial, 1/28/25, at 177-270). Appellant was the sole person present during the time the injuries were inflicted, and Appellant admitted to handling J.P. roughly and shaking him after the child fell multiple times. (*See* N.T. Trial, 1/29/25, at 492, 499-500, Commonwealth's Ex. 68, 68-A, 69, 69-A). On this record, and viewed in the light most favorably to the Commonwealth as verdict-winner, the Commonwealth presented sufficient evidence that Appellant consciously disregarded an unjustified and extremely high risk that his actions might cause death or serious bodily injury to the child. *See Smith, supra*; *DiStefano, supra*. *See also Sebolka, supra*. Accordingly, we affirm.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 02/19/2026