J-S13006-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOSHUA TYLER BOOHER | : | |
| | : | |
| Appellant | : | No. 1426 MDA 2021 |

Appeal from the Judgment of Sentence Entered May 21, 2021
In the Court of Common Pleas of Lebanon County
Criminal Division at No: CP-38-CR-0000970-2018

BEFORE: STABILE, J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STABILE, J.: **FILED: JUNE 16, 2022**

Appellant, Joshua Tyler Booher, appeals from the judgment of sentence imposed on May 21, 2021 in the Court of Common Pleas of Lebanon County after a jury convicted him of, *inter alia*, aggravated assault relating to burn injuries sustained by two-and-a-half-year-old L.B. on April 21, 2018. Appellant contends that the evidence was insufficient to convict him of aggravated assault, that the verdict was against the weight of the evidence, and that the trial court erred by imposing a sentence in the aggravated range for his aggravated assault conviction. Following review, we affirm.

The trial court provided a detailed recitation of the facts elicited at Appellant's trial, complete with citations to the notes of testimony. See Trial

_____

[*] Former Justice specially assigned to the Superior Court.

Court Opinion, 9/23/21, at 2-13. We hereby incorporate the trial court's factual summary as if fully set forth herein. For purposes of this Memorandum, we provide the following abridged version, focusing on trial testimony from L.B.'s father, from Appellant, and from the Commonwealth's medical expert.

As of April 21, 2018, Appellant was residing with L.B.'s father, Seth Buck ("Buck"). The two had been in a romantic relationship since November 2017 and had been residing together since January 2018. Buck and L.B.'s mother, Katrina Tulos, had a week-on/week-off custody arrangement for their son, L.B. On the date L.B. sustained burns, Buck had custody of the child.

On the night of April 21, 2018, Buck gave his son a bath and put him to bed wearing a clean diaper, t-shirt, and pants. As Buck dried L.B. off, he did not notice any marks, bruises, or other injuries on L.B.

Buck left the apartment to buy some hair products at Walmart, an errand that took approximately 30 to 40 minutes, including travel time. L.B. was asleep when Buck left. Video from the store, along with receipts for his purchases, confirmed the time and purchases Buck made.

When Buck returned from Walmart, he saw Appellant running toward the laundry facility across the street from the apartment. When Appellant returned to the apartment, the two were talking when they heard L.B. "fussing." Buck believed L.B. simply woke up and would go back to sleep. Shortly thereafter, however, L.B. began to make louder noises, prompting

Buck to check on him. When Buck entered L.B.'s room, L.B. was holding his hands out to Buck while saying, "Dada, look." Notes of Testimony, Trial, 2/23/21, at 71-72. Buck "just remember[ed] his skin – his skin being really red and loose. It was just dripping off his arms, his hands. He was just shaking." *Id.* at 72.

Buck said that he panicked, tearing through things in L.B.'s room, trying to figure out what L.B. got into. He checked the burners on the stove in the kitchen and checked the radiators, but they were cold. He got frozen vegetables from the freezer to put on L.B.'s arms and called his own mother. Meanwhile, he kept asking Appellant what happened. Appellant kept saying he did not know, but he also told Buck to calm down and said, "[W]e just need to get our stories straight[,]" a comment Buck acknowledged went "way over my head" at the time. *Id.* at 72-73.

L.B. was taken to a nearby hospital but was subsequently transferred to Lehigh Valley Reilly Children's Hospital ("Lehigh Valley") for treatment of second- and third- degree burns to his hands and forearms. The medical records also documented bruising on his right shoulder, on his mid-back on the left and right sides, above his left eyebrow, above his left and right eyelids, on both cheeks, on his earlobe, and on his left leg. Buck's mother explained that the bruises began to appear when they were at the hospital and had not been visible when they were still at the apartment. It also was noted that dirt and pine needles were found in L.B.'s diaper.

- 3 -

L.B. remained hospitalized at Lehigh Valley for three weeks. His medical treatment was extensive and involved several surgeries and multiple therapy sessions. The treatment was ongoing at the time of trial and was anticipated to continue for years to come.

Appellant eventually was arrested and charged with, *inter alia*, aggravated assault, endangering the welfare of children, simple assault, and recklessly endangering another person ("REAP").[1] At his February 2021 trial, the Commonwealth presented the expert testimony of Debra Esernio-Jenssen, M.D., Chief of Child Protection Medicine at Lehigh Valley, who is board certified in both general pediatrics and child abuse pediatrics. Dr. Esernio-Jenssen explained that the burns sustained by L.B. were bilateral immersion burns, which involve "a child being forcibly held in scalding water. So their hands— and in this case, up to the forearms—is immersed and we see what we call splash marks because they're being held, so they're not moving." *Id.* at 153. It was her "opinion that these were inflicted burns." *Id.* at 169. Dr. Esernio-Jenssen also testified about L.B.'s bruises and explained that several of L.B.'s bruises had "high specificity for child abuse." *Id.* at 156-57. "Other than [the] bruise on the leg . . . which I think is a typical location that we see accidental bruises, all the other bruises and the locations are highly suspicious of physical abuse and something [she] would consider abusive bruising." *Id.*

_____

[1] 18 Pa.C.S.A. §§ 2702(a)(1), 4304(a)(1), 2701(a)(1), and 2705, respectively.

- 4 -

at 162. It was her "medical opinion that [L.B.] suffered physical abuse through bruising and an immersion burn." ***Id.*** at 177.

After the Commonwealth rested, Appellant presented expert testimony from a plumber who explained that Buck and Appellant's landlord was using a furnace to heat the hot water for the apartments in their building. When heat is generated from a furnace, water temperature can change suddenly and can easily reach a temperature of 160 degrees with steam visible. By the time the expert first visited the building in the fall of 2019, the water heater had been replaced with one installed sometime in 2019, the year after L.B. was burned. Although the furnace had not been replaced, it was no longer being used to feed the hot water, as it was when L.B. was burned, as evidenced by State Police photos taken shortly after the incident. ***Id.*** at 199-204, 209.

Appellant testified on his own behalf. Although he pleaded ignorance in his statements to police on the night of the incident, at trial he testified that he went into L.B.'s room while Buck was at Walmart and discovered that L.B. had gotten into chocolate from his Easter basket. Appellant stated that he was holding L.B. up at the kitchen sink to wash chocolate from his hands and mouth when "before I knew it, it was just a—there was steam and I—I freaked out. I jumped back and he took a pretty good fall to the counter ledge and fell down onto the floor." ***Id.*** at 221. Appellant explained that he was more concerned about the fall. He noticed L.B.'s hands were red but did not believe L.B. required medical attention. He picked L.B. up, walked him back to his

room, and put him in bed with a stuffed animal. He then left the apartment for the laundry facility.

When Buck returned and discovered L.B.'s condition, Appellant agreed it was obvious L.B. required medical care. When Buck's mother arrived at the apartment, she asked what happened and Appellant "just kept backing myself into a corner. I—I didn't want to say what happened. I didn't think anybody would believe that my ultimate goal in being with L.B. was I always wanted to make [Buck] proud and make him happy." *Id.* at 224-25. He stated that he wanted to tell Buck, and tell everybody, what happened but he was scared. *Id.* at 225, 228. He claimed his attorney for an unrelated matter told him not to say anything to anybody. *Id.* at 227. Appellant testified that when the investigating officer, Pennsylvania State Police Corporal Miller, left a voice mail message saying she wanted to meet to talk more about what happened, "I had ran that by with my prior counsel at that time and counsel told me, no, we're not—you know, we're not doing that." *Id.* at 228.

Following Appellant's testimony, the Commonwealth recalled Dr. Esernio-Jenssen to the stand and asked if her opinion had been altered, having seen the layout of the kitchen sink and having heard Appellant's testimony. She detailed why it did not change her "medical opinion that this was a forced immersion burn and that the bruising pattern is not consistent with, you know, hitting or face planting onto this counter." *Id.* at 244.

The jury returned a verdict of guilty on the charges noted above. On May 19, 2021, the court sentenced Appellant to a term of 66 months to 12 years in prison for aggravated assault and a concurrent term of 18 months to five years for endangering the welfare of children. The simple assault and REAP charges merged for sentencing.

Appellant filed a post-sentence motion, which the court denied. This timely appeal followed. Both Appellant and the trial court complied with Pa.R.A.P. 1925.[2]

Appellant asks us to consider three issues in this appeal:

1. Whether the evidence presented by the Commonwealth at trial was not sufficient to prove the charge of Aggravated Assault beyond a reasonable doubt?

2. Whether the trial court abused its discretion when it denied Appellant's Motion for a New Trial based on the weight of the evidence?

3. Whether [the] trial court abused its discretion when sentencing [Appellant] to an aggravated range because the trial court stated that it believed [Appellant] did not act with the required mental state to cause said injury failing to establish a material element of the crime and the stated factors relied upon to aggravate the sentence were elements of the crime itself?

Appellant's Brief at 7.

_____

[2] We remind Appellant that a copy of the Rule 1925(b) statement is to be appended to an appellant's brief. *See* Pa.R.A.P 2111(a)(11) and (d).

In his first issue, Appellant challenges the sufficiency of the evidence supporting his conviction of aggravated assault. As this Court reiterated in *Commonwealth v. Miller*, 172 A.3d 632 (Pa. Super. 2017):

> We review claims regarding the sufficiency of the evidence by considering whether, "viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt." *Commonwealth v. Melvin*, 103 A.3d 1, 39 (Pa. Super. 2014). Further, a conviction may be sustained wholly on circumstantial evidence, and the trier of fact— while passing on the credibility of the witnesses and the weight of the evidence—is free to believe all, part, or none of the evidence. *Id.* In conducting this review, the appellate court may not weigh the evidence and substitute its judgment for the fact-finder. *Id.* at 39-40.

*Id.* at 640. Further:

> "A person is guilty of aggravated assault if he . . . attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life[.]" 18 Pa.C.S. § 2702(a)(1). The Crimes Code defines "serious bodily injury" as "bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S. § 2301.

*Id.* at 640-41 (cleaned up).

It is undisputed that L.B. suffered serious bodily injury. Importantly, "[w]here the victim suffers serious bodily injury, the Commonwealth is not required to prove specific intent." *Commonwealth v. Patrick*, 933 A.2d 1043, 1046 (Pa. Super. 2007) (citing *Commonwealth v. Nichols*, 692 A.2d 181, 185 (Pa. Super. 1997) and *Commonwealth v. Hlatky*, 626 A.2d 575 (Pa. Super. 1993)). Rather,

- 8 -

[t]he Commonwealth need only prove the defendant acted recklessly under circumstances manifesting an extreme indifference to the value of human life. For the degree of recklessness contained in the aggravated assault statute to occur, the offensive act must be performed under circumstances which almost assure that **injury** or death will ensue.

*Id.* (cleaned up) (citations omitted) (emphasis in original).

Here, the trial court considered Appellant's contention that the Commonwealth failed to prove that Appellant had the requisite mental state to commit aggravated assault, noting Appellant's assertion that there was no evidence he intended to cause L.B.'s injuries. However, as this Court announced in **Patrick**, proof of specific intent is not required if the victim suffers serious bodily injury. **Id.**

Because the fact that L.B. sustained serious injury is not contested, "the Commonwealth had the burden of proving that [Appellant] acted recklessly under circumstances manifesting an extreme indifference to the value of human life." **Hlatky**, 626 A.2d at 581. As defined in Section 302(b)(3):

A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S.A. § 302(b)(3).

As the trial court recognized, in cases involving abuse of a child, "it is sufficient if the defendant acts 'with conscious disregard of a substantial and

unjustifiable risk to a child and that his actions deviated from the standard of conduct that a reasonable person would observe in that situation.'" Trial Court Opinion, 9/23/21, at 18 (quoting **Hlatky**, 626 A.2d at 581). As reflected above, Dr. Esernio-Janssen testified that the burns suffered by L.B. were immersion burns, not accidental burns, meaning L.B.'s hands were being forcibly held in scalding water. Notes of Testimony, Trial, 2/23/21, at 153, 169. Further, as Dr. Esernio-Jenssen explained, several of L.B.'s bruises had "high specificity for child abuse." **Id.** at 156-57.

Viewing the evidence and all reasonable inferences therefrom in favor of the Commonwealth, we conclude the record provides ample support for the jury to find that Appellant acted at least recklessly, under circumstances manifesting extreme indifference, causing serious injury to L..B. Therefore, Appellant's sufficiency challenge to his aggravated assault conviction fails.

In his second issue, Appellant contends the aggravated assault verdict was against the weight of the evidence.[3] As our Supreme Court explained in **Commonwealth v. Clay**, 64 A.3d 1049 (Pa. 2013):

> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of

---

[3] Appellant properly preserved his weight of the evidence claim by raising it in his post-sentence motion. **See** Pa.R.Crim.P. 607(A)(3) ("a claim that the verdict was against the weight of the evidence shall be raised with the trial judge in a motion for a new trial . . . in a post-sentence motion.").

the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. It has often been stated that a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.

*Id.* at 1054-55 (internal quotations and citations omitted). Further:

An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:

Appellate review of a weight claim *is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.* Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Id.* at 1055 (quoting ***Commonwealth v. Widmer***, 744 A.2d 745, 753 (Pa. 2000) (emphasis added) (internal citations omitted)).[4]

Appellant contends that "[t]he jury gave too much weight to Appellant causing the injury" and "was blinded by the nature and extent of the injury[.]" Appellant's Brief at 19. As the trial court observed:

---

[4] "A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict. Thus, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner." ***Widmer***, 744 A.2d at 751 (citations omitted).

- 11 -

Undoubtedly, L.B. suffered horrific burns. It was impossible to hide the severity of those injuries from the jury. Such evidence was necessary to establish that L.B. suffered serious bodily injury. It was uncontroverted that [Appellant] caused these burns to occur. The Commonwealth provided ample evidence of the cause of L.B.'s burns by Dr. Esernio-Jenssen's testimony. It is obvious that the jury accepted the Commonwealth's evidence and did not believe [Appellant's] version of the incident. We find nothing to shock our sense of justice in the jury's determination of the credibility of these witnesses and we find no reason to disturb its verdict.

Trial Court Opinion, 9/23/21, at 20.

We find no abuse of discretion on the part of the trial court. Appellant's weight of the evidence claim lacks merit.

In his final issue, Appellant argues the trial court abused its discretion by sentencing Appellant in the aggravated range for his aggravated assault conviction. As such, Appellant presents a challenge to the discretionary aspects of sentence.

As this Court has recognized:

"[T]here is no absolute right to appeal when challenging the discretionary aspect of a sentence." *Commonwealth v. Crump*, 995 A.2d 1280, 1282 (Pa. Super. 2010). Rather, an "[a]ppeal is permitted only after this Court determines that there is a substantial question that the sentence was not appropriate under the sentencing code." *Id.* A defendant presents a substantial question when he "sets forth a plausible argument that the sentence violates a provision of the sentencing code or is contrary to the fundamental norms of the sentencing process." *Id.* In order to properly present a discretionary sentencing claim, a defendant is required to preserve the issue in either a post-sentence motion or at sentencing and in a court-ordered Pa.R.A.P. 1925(b) concise statement. Further, on appeal, a defendant "must provide a separate statement specifying where the sentence falls in the sentencing guidelines, what provision of the sentencing code has been violated, what fundamental norm the

- 12 -

sentence violates, and the manner in which it violates the norm." ***Id.***

***Commonwealth v. Naranjo***, 53 A.3d 66, 72 (Pa. Super. 2012).

In order to challenge the discretionary aspects of his sentence, Appellant must invoke this Court's jurisdiction by satisfying a four-part test. ***Commonwealth v. Moury***, 992 A.2d 162 (Pa. Super. 2010). In ***Moury***, we explained:

> [W]e conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, ***see*** Pa.R.Crim.P. [720]; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

***Id.*** at 170 (citation omitted).

Here, Appellant raised a sentencing claim in his post-sentence motion and repeated that claim in his Rule 1925(b) statement. However, he did not include a Rule 2119(f) statement in his brief. Pennsylvania Rule of Appellate Procedure 2119(f) directs that

> [a]n appellant who challenges the discretionary aspects of a sentence in a criminal matter shall set forth in a separate section of the brief a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of a sentence. The statement shall immediately precede the argument on the merits with respect to the discretionary aspects of the sentence.

Pa.R.A.P. 2119(f).

"[C]laims relating to the discretionary aspects of a sentence are waived if an appellant does not include a Pa.R.A.P. 2119(f) statement in his brief and the opposing party objects to the statement's absence." *Commonwealth v. Brougher*, 978 A.2d 373, 375 (Pa. Super. 2009) (citation omitted). However, the Commonwealth did not object to the absence of the statement. Therefore, we will not find it waived. *See id.*

We next consider the fourth prong of the test: whether Appellant has raised a substantial question that the sentence is not appropriate under the Sentencing Code.

> In *Moury*, this Court stated:
>
> The determination of what constitutes a substantial question must be evaluated on a case-by-case basis. A substantial question exists only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process.
>
> As to what constitutes a substantial question, this Court does not accept bald assertions of sentencing errors. *Commonwealth v. Malovich*, 903 A.2d 1247, 1252 (Pa. Super. 2006). An appellant must articulate the reasons the sentencing court's actions violated the sentencing code. *Id.*

*Moury*, 992 A.2d at 170 (internal quotations and some citations omitted).

Appellant has not articulated any reasons for his assertion that the sentencing court violated the sentencing code. In essence, he bases his claim on an assertion that "the trial court stated on the record that he didn't believe that Appellant was guilty of the crime of aggravated assault" yet "proceeded to sentence the Appellant to an aggravated range to a crime the court believed

- 14 -

he didn't commit which is an unreasonable decision." Appellant's Brief at 22-23.

> Trial court rejected Appellant's assertion, explaining:
>
> [Appellant] claims that [the c]ourt stated at sentencing that it did not believe that [Appellant] was guilty of the crime of aggravated assault; however [Appellant] misconstrues the statements made by the court at sentencing.
>
> The court did not question [Appellant's] guilt on the charge of aggravated assault. We merely stressed that we viewed [Appellant's] level of culpability as recklessness within the language of the statute, and our belief that, although [Appellant] did not necessarily intend to cause such severe injuries, he did intend to immerse L.B.'s hands and arms.
>
> . . . [W]e agree with the jury's determination that [Appellant's] culpability rose to the level required by the aggravated assault statute—that [Appellant] had intentionally held L.B.'s hands and arms in scalding water, thereby acting "recklessly under circumstances manifesting extreme indifference to the value of human life." 18 Pa.C.S.A.. § 2702(a)(1). This goes beyond the level of mere recklessness and is the level necessary to sustain this conviction on this charge.
>
> . . .
>
> In this case, we fully discussed the reasons for the sentence imposed at the sentencing proceeding. Given the severity of L.B.'s injuries and how they occurred, we determined that [Appellant] deserved total confinement. In determining the length of that confinement, we considered the ranges suggested by the sentencing code and discussed the factors which led us to deviate to the aggravated range on the charge of aggravated assault. We also considered the factors relevant to a potential mitigated range and determined that those did not warrant any lesser sentence.

Trial Court Opinion, 9/23/21, at 21-22 (some capitalization omitted).

To the extent Appellant has raised a substantial question under Section 9721(c)(2), *i.e.*, that the court sentenced him within the guidelines but the

case involves circumstances where the application of the guidelines would be clearly unreasonable, we find no abuse of discretion in the trial court's imposition of a sentence in the aggravated range. Therefore, we shall not disturb the sentence.

Judgment of sentence affirmed. In the event of further proceedings, the parties shall attach a copy of the 9/23/21 trial court opinion to their filing.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/16/2022

# ORIGINAL

ENTERED & FILED
CLERK OF COURTS
LEBANON, PA
2021 SEP 23 A 9: 2?

IN THE COURT OF COMMON PLEAS OF LEBANON COUNTY
PENNSYLVANIA

### CRIMINAL DIVISION

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | NO. CP-38-CR-970-2018 |
| | : | |
| v. | : | |
| | : | |
| JOSHUA BOOHER | : | |

**APPEARANCES:**

**NICHOLE EISENHART, ESQUIRE**          **FOR THE COMMONWEALTH**
**FIRST ASSISTANT DISTRICT ATTORNEY**

**JOSHUA HARSHBERGER, ESQUIRE**          **FOR JOSHUA BOOHER**
**JACOBSON, JULIUS, AND HARSHBERGER**

## OPINION, TYLWALK, P.J., SEPTEMBER 22, 2021.

After a jury trial was conducted on February 23, 2021, Defendant was

convicted of one count of Aggravated Assault (Causing Serious Bodily Injury),

Endangering the Welfare of Children, Simple Assault, and Recklessly Endangering

Another Person[1] due to injuries inflicted on a young child on April 21, 2018 while

the child was in Defendant's care at his apartment in Myerstown. On May 19,

---

[1] Counts 1 through 4, 18 Pa.C.S.A. § 2702(a)(1), 18 Pa.C.S.A. §4304(a)(1), 18 Pa.C.S.A. §2701(a)(1), and 18 Pa.C.S.A. §2705, respectively. Defendant was also charged with the summary offense of Harassment, 18 Pa.C.S.A. §2709(a)(1).

1

2021, we sentenced Defendant to a period of incarceration of sixty-six months to twelve years on the charge of Aggravated Assault and eighteen months to five years on the charge of Endangering the Welfare of Children, to run concurrently. The charges of Simple Assault and Recklessly Endangering Another Person merged for sentencing purposes. Defendant has filed a Post-Sentence Motion in which he challenges the sufficiency of the evidence with regard to the charge of Aggravated Assault, argues that the verdicts were against the weight of the evidence, and charges that the Court erred in sentencing him within the aggravated range on the Aggravated Assault charge. Both parties have filed Briefs and the Motion is presently before us for disposition.

At the jury trial, Katrina Tulos, mother of five-year-old L.B., testified that her son was born on October 13, 2015. She explained that at the time of this incident, she and L.B.'s father, Seth Buck, had a week on/week off custody arrangement. The parents would pick L.B. up from daycare on alternating Friday afternoons and keep L.B. for their weeklong period of custody.

On the Friday before the incident, Buck had picked L.B. up from daycare and taken him to his apartment, which he shared with Defendant. At approximately 8:30 to 9:00 that evening, Tulos was at a restaurant when she received a call from Buck telling her to meet him in the emergency room at Good

2

Samaritan Hospital ("GSH") because L.B. had been burned. Shortly after she arrived at the emergency room, Buck arrived with L.B. L.B. was holding out his arms which were red and blistered and there was fluid running down them. As the evening progressed, Tulos also noted that bruises began to appear on L.B.'s face. Tulos confirmed that L.B. did not have any burns or bruising when she had dropped him off at daycare on Friday. Tulos identified a number of photographs which were taken of L.B. that evening which showed L.B.'s injuries. (Exhibits "2," "5")

After spending a few hours at GSH, L.B. was transferred to Lehigh Valley Hospital. He underwent surgery within the next twenty-four hours. L.B. remained in that facility for three weeks during which he had multiple additional surgeries and was sedated due to the extreme pain he experienced when his dressings were changed. Since that time, L.B. has had numerous additional surgeries and procedures. He must also undergo web releasing to expand and straighten his skin because his hands are contracted and his fingers are locked up. He has had to attend occupational therapy three times per week and must perform hand exercises. He continued to wear a splint at the time of the jury trial.

3

At the trial, the Commonwealth presented the parties' stipulation to the jury. In its Brief, the Commonwealth summarizes the stipulation as follows:

On April 21, 2018, L.B. was two years old. He presented with "bilateral upper extremity burns extending from mid-forearm to hands obtained just prior to arrival." N.T. 2/23/21 at pg. 26. L.B. was seen immediately "because of high possibility of imminent or life-threatening deterioration in patient's condition." N.T. 2/23/21 at pg. 27. L.B. was in distress when he was being examined. He had large circumferential burns from mid arms to his hands and abrasions to his neck, right knee, temporal area, and on his back. There was dirt and pine needles in his diaper. N.T. 2/23/21 at pg. 27. L.B. was provided fentanyl so he could rest confortably. N.T. 2/23/21 at pg. 27. He was transported to the Lehigh Valley Burn Center. N.T. 2/23/21 at pg. 27.

(Commonwealth's Brief at p. 3). Pursuant to the stipulation, the medical records from GSH and Lehigh Valley Hospital were admitted into evidence. (Exhibits "9" and "10")

The Commonwealth next called Trooper Kenneth Dahler of the Pennsylvania State Police ("PSP"). Trooper Dahler was on duty as a patrol trooper on the night of this incident. He and his partner, Trooper George Shimko, were dispatched to the GSH emergency room to investigate this incident and arrived there shortly after midnight. After speaking with the medical professionals, they were able to observe and interview Tulos, Buck, and Defendant at GSH.

Trooper Dahler spoke to Defendant and obtained a written statement. (Exhibit "7") Defendant told Trooper Dahler that he and Buck had given L.B. a

4

bath around 8:45 to 9:00 p.m. and put him to bed. After Buck left for WalMart, Defendant stated that he had used the restroom and cleaned the apartment. After he checked on L.B., he walked across the street to the apartment laundry facility, being gone approximately six minutes. He was adamant that they always locked the doors when they left the apartment. When he was returning from the laundry room, Buck was returning home and the two went in and started watching television. He claimed that nothing seemed out of the ordinary during this time. After a short time, L.B. began to fuss and Buck went to check on him and started screaming. When they saw L.B.'s injuries, they called Buck's mother and Defendant's aunt and then left for the hospital. Trooper Miller also arrived at GSH later in the evening and interviewed Defendant. When speaking with Corporal Erica Miller, Defendant stated that he had not locked the apartment door when he went to the laundry room. The Troopers noted that Defendant seemed annoyed that they were asking him about the incident.

Buck testified that he and Defendant had moved in together around January 2018. Their apartment was on the first floor of a building which was located on Railroad Street in Myerstown. The laundry facility was located across the street in the basement of another building owned by the landlord. Buck explained that his niece had stayed overnight at the apartment the prior evening

5

and that he and Defendant had taken L.B. and his niece to the playground earlier on April 21, 2018. When L.B. became tired, they left the park and dropped his niece off on the way back to the apartment. When they returned to the apartment, Defendant fell asleep and Buck woke him up for dinner. Buck then gave L.B. a bath. There was no problem with the water temperature and L.B. stayed in the tub and played for approximately twenty minutes. L.B. did not have any bruises or injuries at that point. He placed a new diaper on L.B. and put him to bed at 9:00, leaving a night light on in his room.

Buck explained that when he returned to the living area, Defendant was looking through his phone and asked Buck to do something with Defendant's hair. Buck told him they would need some hair products from WalMart. The two argued about who would go to Walmart with Buck ultimately deciding to go for the products. Before leaving for WalMart, Buck noticed that L.B. was asleep.

When Buck returned, he saw Defendant running across the street to the laundry room. He went into the apartment and Defendant came in a short time later. L.B. began to whine and then began to cry. He went into the room and the night light was off. L.B. was sitting at the edge of his bed with his arms out saying "Dada look." Buck saw that L.B. was shaking, his skin was red and loose and there was liquid dripping off his arms and hands. Buck checked the burners and the

6

radiators and found nothing in the apartment that could have caused the injuries. He did not understand the severity of the injuries at that point so he put frozen vegetables on L.B.'s skin and called his own mother.

Buck explained that he was panicking at that point and saying that he was going to lose his son. Defendant was also panicking. When asked what happened, Defendant said he did not know and told Buck "calm down, we just need to get our stories straight." (N.T. 73) A short time later, Buck's mother arrived at the apartment and they took L.B. to GSH. He called Tulos on the way and told her to meet them there. Defendant never told him that he had left L.B. alone or how the injuries had occurred.

Buck explained that when he and Defendant had first moved into the apartment, they had experienced difficulties with the water temperature and contacted their landlord. In response, the landlord advised them that the hot water needed to be diluted. They had always been able to adjust the water temperature and they had never had a problem with the water temperature prior to this incident.

Joann Buck, Buck's mother and L.B.'s grandmother, also testified at the jury trial. She explained that she received several calls from her son saying that L.B. had been burned. After receiving the calls, she immediately left her home in

7

Fredericksburg and estimated that she arrived at the apartment within ten minutes. When she arrived, she saw that L.B. looked shocked. The skin on his arms and hands was white and hanging off his body. As they were getting into the car to leave for GSH, she noticed that Defendant was hesitating and walking toward his own vehicle. When she asked where he was going, he said that he wasn't going to go to the emergency room with them; however, he did go with them after she told him to get in their car. Mrs. Buck identified a series of photographs which depicted L.B.'s condition at the hospital. (Exhibit "13") She explained that the bruises that developed on his face as the evening went on were not there when they were at the apartment and only began to appear once they were at the hospital.

At the trial, Corporal Miller testified that when she arrived at GSH, L.B. had already been transferred to Lehigh Valley Hospital. She was told that no one knew what had happened. However, hospital personnel informed her that this was not something that L.B. would have done to himself and that he was either dunked in extremely hot water or a chemical. Buck granted permission for the apartment to be searched on April 22. After receiving permission, Corporal Miller went to the apartment to check for any explanation as to how L.B. was burned; however, she found nothing to explain his injuries. She also confirmed that Buck

8

had gone to WalMart by obtaining surveillance video and receipts. (Exhibit "6)

When she interviewed Defendant at GSH, he seemed irritated. He told her that he was at the laundry facility for six minutes and insisted that he did not know how the injuries occurred.

Corporal Miller confirmed that she had never responded to the apartment complex for burn issues prior to this incident. On May 1, 2018, she, Detective DiPalo, and Corporal Levan conducted an evaluation of the water temperature in the kitchen and bathroom of the apartment. (Exhibit "3") Neither Buck or Defendant was in the apartment at the time. The highest water temperature they recorded was 154.2 degrees at the kitchen sink. The landlord had advised Corporal Miller that the hot water was provided by a furnace which was set at 160 degrees and provided service to eight units.

While the tests were being conducted, Corporal Miller noticed a handwritten document laying on the coffee table in the living room. Buck identified the document as being Defendant's handwriting. (Exhibit "4") The document, which was not there when the apartment was originally searched, gave the same version of the events of April 21, 2018 as Defendant had given to the Troopers.

The Commonwealth next called Dr. Debra Esernio-Jenssen, the Chief of Child Protection Medicine at Lehigh Valley Reilly Children's Hospital. Dr. Esernio-Jenssen was qualified as an expert in the area of general pediatrics, child abuse, and child abuse concerning burns. She had reviewed L.B.'s case with Dr. Barbara Katz, who had evaluated L.B. personally, due to concerns that he might have suffered abuse. Dr. Esernio-Jenssen noted that the burns on L.B.'s arms had a clear demarcation between the burned and normal skin and determined that the injuries were what are known as immersion burns:

> So an immersion burn involves a child being forcibly held in scolding water. So their hands – and in this case, up to the forearm – is immersed and we see what we call splash marks because they're being held, so they're not moving. And the depth and the uniformity of the burn is also there and also symmetric.

(N.T. 1/23/21 at 153)

Dr. Esernio-Jenssen further explained that this type of burn would have required someone to hold L.B.'s hands under water as there is a natural instinct to withdraw from pain. She explained that if L.B. had placed his own hands in a sink filled with scalding water, he would have immediately pulled back when his fingertips hit the water. Immersion burns take the shape of a glove and there is equal distribution of the burned area. These burns were not considered to be flow burns, which result from the flow of water over the body and were not

10

consistent with L.B. washing his hands at the sink and the water suddenly becoming scalding. In flow burns, the area first struck has the greatest damage. With flow burns, there is not an even distribution of burning as was the case with L.B.'s injuries. Dr. Ersenio-Jenssen testified that it would only take a split second for a child's skin to burn if being held in water at a temperature of 150 degrees.

Dr. Ersenio-Jenssen explained that L.B. had second and third degree burns on his hands and arms, equal to ten percent of his body surface. The third degree burns had the potential to cause the loss of L.B.'s hands. These injuries were extremely painful and also impacted L.B. emotionally. L.B. would have to be sedated so that the burned skin could be removed by scrubbing it off. He needed skin grafts in order for the burns to heal. His fingers became fused together repeatedly and had to be cut, he developed an infection and required laser treatments, and multiple surgeries were performed to relieve the pressure in his hands.

Dr. Ersenio-Jenssen opined that these were inflicted burns which could have only been caused by submersion and that there was no plausible explanation as to how they would have occurred accidentally. She explained that when an adult washes a child's hands, the adult would have the child's hands inside their own while lathering soap and rinsing. If there was a sudden burst of

11

hot water, the adult's reflexes, just like a child, would cause the adult to withdraw his hand. If the adult was holding the child up against a sink and the adult forced himself back, the child was most likely to fall first hitting his feet and then fall backwards and hit his head. There would be no injuries to the face.

Dr. Ersenio-Jenssen also noted that L.B. had multiple bruises on his body, including his cheeks, ears, and eyelids. (Exhibit "20") She explained that these areas of the body require more force than other areas to cause bruising and have high specificity for child abuse. She explained that the fact that L.B. was bruised on multiple different body parts and that the bruises were located on areas of the body that children don't usually bruise accidentally also pointed to his being a victim of abuse.

Defendant called Gardell Weaver, a plumber who had examined the water heater at the building where the apartment was located. Weaver explained that the water heater that was in use at the time of this incident had been replaced in 2019 and that he had examined the new heater. He had also examined photographs of the prior water heater taken by the PSP during their investigation. Weaver explained that the photos of the old heater indicated that the particular unit had no safeguards on it with regard to water temperature. He opined that the configuration of the old heater and the number of apartments it served were

12

such that sudden bursts of extremely hot water would have been possible at the time of this incident.

Defendant also testified at the trial. He testified that he was nineteen years old at the time of this incident and had been in a romantic relationship with Buck since November 2017. He noted that he and Buck had previously experienced problems with the water temperature in the apartment.

He explained that after Buck left for WalMart, L.B. woke up and got into some Easter candy and had chocolate all over himself. Defendant picked L.B. up and wedged him between himself and the kitchen sink to wash his hands. When he first started to have L.B. place his hands under the running water, the water was at a good temperature. However, steam suddenly came out of the faucet and he freaked out. He claimed that he "jumped back and he took a pretty good fall to the counter ledge and fell down onto the floor." (N.T. at 221) Defendant testified that L.B. was not crying and did not seem to be seriously injured so he consoled him and put him back to bed. When questioned why he did not report what actually happened to Buck and the police, he said that he did not want to tell because he did not want to jeopardize his relationship with Buck. He eventually told his own mother what happened and she was the person who told him to write down what happened.

13

At Sentencing, the Court stated its belief that L.B.'s burns were not caused by washing his hands under running water, (N.T. Sentencing, 5/19/21 at 16), and that "L.B.'s hands had to be held in that water for some period of time." (N.T. Sentencing, 5/19/21 at 16) The Court explained:

> I believe that what Mr. Booher did, in terms of holding L.B.'s hands in the water, was intentional. He intentionally held his hands there, and I think that was done without really understanding what the consequence could ultimately be.
>
> So I don't believe that Mr. Booher intentionally intended to cause these burns to L.B., but he surely is responsible for the reckless nature of his behavior. And Aggravated Assault, Simple Assault, they talk about reckless behavior. But him holding the hands under the water, that was intentional. The consequences that come from that, intending maybe to burn L.B. that badly, I don't know that that's really what he intended.

(N.T. Sentencing, 5/19/21 at 20)

The Court determined that the circumstances of this case warranted a sentence in the aggravated range of the Sentencing Guidelines based on a number of factors:

- Failure to assist the victim or acted in disregard to the victim. (Although Defendant did not necessarily know the extent of L.B.'s injuries, he surely knew he was injured, but just placed him back in his crib.)

- Inflicted extreme cruelty on the victim. (The photographs of L.B.'s injuries were "some the most disturbing photographs I have seen in 45 years in law ... ." (N.T. Sentencing 5/19/21 at 21)

14

- The victim was particularly vulnerable because of his youth. (L.B. was in the care of Defendant.)

- The victim was in the care of the Defendant at the time of the assault. (Defendant was watching L.B. while Buck went to WalMart.)

- Defendant's lack of concern with L.B.'s wellbeing. (Defendant claimed to know nothing about how L.B. was burned:

    "He knew something happened, and again I don't think that was the complete truth, but he knew. Did he cooperate with the police? No. I've heard descriptions of Mr. Booher's attitude and demeanor at the hospital and whatnot, a seeming lack of concern, a seeming irritation of, jeez, why are you even talking to me about this?" (N.T. Sentencing 5/19/21 at 22))

- A lesser sentence would depreciate the seriousness of these crimes.

    ("There are not a whole lot of things that have come before me in my 30 years as a Judge where I've said, you know, this merits an aggravated-range sentence, but this does in this case." (N.T. Sentencing 5/19/21 at 23))"

- Lack of remorse.

    ("If I had to look at his behavior that night, I would say remorse was totally absent. ...

    Now, I know he appeared to be somewhat remorseful at trial. ... I think there are other reasons actually that come into play here. He's facing the endgame here. He knows he's going to the state prison and it's just a matter of how much, right? So, sure I'm going to be remorseful today." (N.T. Sentencing 5/19/21 at 23))

15

The Court also noted that it had reviewed the mitigating factors of the case - the fact that Defendant was only nineteen years old at the time of the incident and his limited criminal record. However, when reviewing the record of his prior criminal charges we noted that Defendant had changed his explanations of the incident, just as he had done in this case:

> "it caused me to be squeamish. ... You've got this issue where first he says, oh, it was self-inflicted. Then he says, no, wait a minute, I was robbed and the guy who robbed me – oh, no, wait a minute, it was Seth that injured me. And then finally he comes back around to it was self-inflicted with a knife. ... You know, it just made me – I read that and I think, okay, what does that say about this person in terms of accepting accountability? You know, he's willing to lie – potentially to get Seth in trouble, by the way – but he's willing to lie about that incident." (N.T. Sentencing 5/19/21 at 24)
>
> ...
>
> "So when I determined what sentence I would impose in this case, I looked at all of those factors, I considered the guideline ranges, both the standard range and the aggravated range, and I've selected a sentence which I believe is appropriate. I know the Commonwealth is asking for a consecutive sentence. I thought about that. I am not going to do that. I am going to do the aggravated range on the Aggravated Assault." (N.T. Sentencing 5/19/21 at 26)

### Sufficiency of the Evidence for Charge of Aggravated Assault

Defendant first challenges the sufficiency of the evidence to support his conviction for Aggravated Assault. In considering a challenge to the sufficiency of the evidence, the Court is required to

16

determine whether the evidence, and all reasonable inferences deducible from that, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish all the elements of the offense beyond a reasonable doubt. We may not weigh the evidence and substitute our judgment for the fact-finder. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence.

*Commonwealth v. Lippert,* 887 A.2d 1277, 1279 (Pa. Super. 2005 (internal citations omitted).

Defendant was charged with Aggravated Assault pursuant to 18 Pa.C.S.A. § 2702(a)(1). To sustain a conviction under this section, the evidence must establish that the defendant "attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life." 18 Pa.C.S.A.§2702(a)(1). Serious bodily injury is defined as "bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of function of any bodily member or organ." 18 Pa.C.S.A. §2301.

Defendant charges that the Commonwealth failed to prove the second element of this offense – that Defendant had the requisite mental state to commit this crime. He argues that there was no evidence of intentionality as there was no evidence that he intended to cause such injuries. He further argues

17

that the Commonwealth failed to prove that he acted recklessly as there was no evidence that he consciously disregarded a substantial and unjustifiable risk that his conduct would result in a life-threatening injury. He argues that a determination of recklessness alone is not enough to sustain a conviction.

The Crimes Code defines recklessness as follows:

(3) A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S.A. §302(b)(3). With regard to cases involving abuse of a child, it is sufficient if the defendant acts "with conscious disregard of a substantial and unjustifiable risk to a child and that his actions deviated from the standard of conduct that a reasonable person would observe in that situation."

*Commonwealth v. Hlatky*, 626 A.2d 575, 581 (Pa. Super. 1993).

The Superior Court has stated that

nothing more than common sense is needed to know that the violent shaking of an infant child provides for a substantial and unjustifiable risk of serious bodily injury. Violently shaking the child in light of such an obvious risk goes far beyond mere criminal negligence, to malice. Given the evident force of the shaking and the enormous difference in size and strength between Appellant and the child, the Commonwealth did prove a heightened degree of recklessness beyond a reasonable doubt.

18

*Commonwealth v. Smith*, 956 A.2d 1029, 1037 (Pa. Super. 2008).

There is no doubt that L.B. suffered serious bodily injuries. His burns were so severe that he could have lost his hands. Dr. Ersenio-Jenssen testified that the pattern of these injuries was such that they could have only been inflicted by the immersion of L.B.'s arms and hands in scalding hot water. Defendant admitted that he knew of the problem with the high water temperature well before the night of this incident and was undoubtedly aware that scalding water could cause burns to one's skin. Irrespective of these circumstances, however, he intentionally submersed L.B.'s hands and arms into scalding water, consciously disregarding the risk that the scalding water presented a substantial and unjustifiable risk of injury to L.B. We believe this evidence established that Defendant was reckless within the meaning of the Aggravated Assault statute and had the requisite state of mind to support a conviction on this charge.

### Weight of the Evidence

Defendant next challenges the weight of the evidence to support his convictions, charging that the jury was blinded by the severity of L.B.'s injuries, gave too much weight to the fact that Defendant had caused those injuries, and failed to consider the evidence regarding his mental state.

19

A verdict is against the weight of the evidence only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice. A weight of the evidence claim is primarily directed to the discretion of the judge who presided at trial, who only possesses narrow authority to upset a jury verdict on a weight of the evidence claim. Assessing the credibility of witnesses at trial is within the sole discretion of the fact-finder. A trial judge cannot grant a new trial merely because of some conflict in testimony or because the judge would reach a different conclusion on the same facts, but should only do so in extraordinary circumstances, when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.

*Commonwealth v. Blakeney,* 946 A.2d 645, 652-653 (Pa. 2008) (internal citations omitted). The finder of fact is free to believe all, part, or none of the evidence presented at trial. *Commonwealth v. Hlatky, supra.*

Undoubtedly, L.B. suffered horrific burns. It was impossible to hide the severity of these injuries from the jury. Such evidence was necessary to establish that L.B. suffered serious bodily injury. It was uncontroverted that Defendant caused these burns to occur. The Commonwealth provided ample evidence of the cause of L.B.'s burns by Dr. Ersenio-Jenssen's testimony. It is obvious that the jury accepted the Commonwealth's evidence and did not believe Defendant's version of the incident. We find nothing to shock our sense of justice in the jury's determination of the credibility of these witnesses and we find no reason to disturb its verdict.

## Sentencing

Lastly, Defendant claims error on the part of the Court in sentencing him within the aggravated range on the charge of Aggravated Assault. He claims that Court stated at Sentencing that it did not believe that Defendant was guilty of the crime of Aggravated Assault; however, Defendant misconstrues the statements made by the Court at Sentencing.

The Court did not question Defendant's guilt on the charge of Aggravated Assault. We merely stressed that we viewed Defendant's level of culpability as recklessness within the language of the statute, and our belief that, although Defendant did not necessarily intend to cause such severe injuries, he did intend to immerse L.B.'s hands and arms.

Defendant argues that recklessness is not sufficient to find a person guilty of Aggravated Assault. Although recklessness alone may not be sufficient, we agree with the jury's determination that Defendant's culpability rose to the level required by the Aggravated Assault statute – that Defendant had intentionally held L.B.'s hands and arms in scalding water, thereby acting "recklessly under circumstances manifesting extreme indifference to the value of human life." 18 Pa.C.S.A. §2702(a)(1). This goes beyond the level of mere recklessness and is the level necessary to sustain this conviction on this charge.

21

Sentencing is a matter within the discretion of the sentencing court. *Commonwealth v. Whitman*, 880 A.2d 1250, 1252 (Pa. Super. 2005). In formulating an appropriate sentence, the sentencing court must consider "that the sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant." *Id*. The sentencing court must consider the sentencing guidelines set forth at 204 Pa. Code §303.1 *et seq*. When a sentencing court decides to deviate from these guidelines, it must provide a written statement of the reason for the deviation. 42 Pa.C.S.A. §9721(b).

In this case, we fully discussed the reasons for the sentence imposed at the Sentencing proceeding. Given the severity of L.B.'s injuries and how they occurred, we determined that Defendant deserved total confinement. In determining the length of that confinement, we considered the ranges suggested by the Sentencing Code and discussed the factors which led us to deviate to the aggravated range on the charge of Aggravated Assault. We also considered the factors relevant to a potential mitigated range and determined that those did not warrant any lesser sentence.

Defendant complains that we improperly considered his failure to disclose what happened to L.B. as an infringement on his right against self-incrimination. However, we made no such remarks and this was not a consideration in the imposition of his sentence. Rather, we spoke of his attitude, demeanor and behavior as indicators of his lack of concern and callous disregard for L.B.'s wellbeing and his lack of remorse for whatever happened to L.B. that evening. We believe we based the sentence on proper considerations and that the length of his confinement was appropriate under all the circumstances of the case.

For these reasons, we will deny Defendant's Post-Sentence Motion.